Plymouth District Court
No. 2006-386

THE STATE OF NEW HAMPSHIRE

v.

DAVID CRAVEIRO, II

Argued: April 5, 2007
Opinion Issued: May 10, 2007

*Kelly A. Ayotte*, attorney general (*Elizabeth J. Baker*, attorney, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, David Craveiro, II, appeals a decision of the Plymouth District Court (*Samaha*, J.) denying his motion to suppress evidence obtained as a result of the stop of his automobile. We reverse and remand.

The following facts are contained in the record. The defendant was charged with operating after suspension, second offense. *See* RSA 263:64 (2004). Prior to trial, he filed a motion to suppress, alleging that his vehicle was stopped "on the sole basis of driving through a puddle." The State filed an objection, arguing that the stop was justified under both the community caretaking and the emergency aid exceptions to the warrant requirement.

The trial court heard testimony on the motion in conjunction with the trial. Warren Davis, acting chief of the Wentworth Police Department, was the sole witness. He testified that on October 9, 2005, he and a highway agent were driving around the Town of Wentworth, checking the roads for downed trees, flooding and other damage following a period of heavy rain. They came across a heavily flooded area adjacent to Roland Town Road, and stopped to evaluate where the water was coming from. Davis testified that there was water filling the ditches on either side of the road, so he parked his vehicle in the middle of the road, which was dry. On the left side

of the road, water was running out of a field down the ditch line and "varied anywhere from five inches going back towards the ditch to about a foot, foot and a half . . . ." Davis did not have his lights activated, and no hazard signs or flares had been set up to warn oncoming motorists of the flooding.

Davis testified that while he and the highway agent were in the cruiser, he observed a car coming towards them at a slow rate of speed. The car slowly pulled to the left side of the chief's cruiser, into the water in the ditch line, and continued around the cruiser. The car went "deeper off to the side of the road, which meant [it] was going into deeper water." The water covered its front wheel almost up to the bumper, which was approximately six inches above the ground. However, the car did not stall, nor did Davis see the defendant commit any traffic offense. Davis' immediate reaction to what he was observing was that "it raised my suspicion, because an ordinary person driving . . . I would have thought would have stopped, allowed me to move my unit on the dry part of the road, move it out of the way so that they could proceed up the road." Davis was concerned for the safety of the vehicle and its operator, so he rolled down his window and told the operator to stop.

Prior to stopping the car, Davis recognized the driver to be the defendant, whom he knew had been convicted of driving under suspension the previous August. He did not, however, know whether the defendant's license had been reinstated.

After the defendant had stopped the car, Davis approached the driver's side window and asked the defendant "what he was attempting to do by driving around the police unit." The defendant replied that he was on his way to a house up the road. Davis then asked the defendant to produce his license and registration. The defendant could not produce either, and informed Davis that his license had been suspended.

While speaking with the defendant, Davis was called to respond to an emergency in which another car and its occupants were possibly stranded in a river because of high flooding. Knowing that the defendant lived close by, Davis told him to "get the vehicle off the road," and let him go. Davis testified that "[t]here was no emergency, at that point, for him to just drive up the road."

After Davis' testimony, the trial court heard arguments on the motion to suppress. The court prohibited the State from arguing that the stop was justified by Davis' reasonable suspicion that the defendant's license was still under suspension, because the State did not raise this issue in its written objection to the motion to suppress. Thus, the State argued that the stop was justified under both the community caretaking and emergency aid exceptions to the warrant requirement. The court was

apparently persuaded that the community caretaking exception applied, and denied the motion ruling that "there was a good-faith attempt to safeguard the defendant's own property under the circumstances." At the conclusion of the trial, the court convicted the defendant of driving after revocation or suspension. *See* RSA 263:64.

On appeal, the defendant argues that the community caretaking exception should not apply to the stop of a moving vehicle. He argues that the community caretaking exception applies to a minimal intrusion, for example, when the vehicle is already stopped or disabled. *See, e.g., State v. Brunelle*, 145 N.H. 656, 659 (2000). The defendant argues that when the police stop a moving vehicle, the intrusion is such that, without reasonable suspicion, it can be justified only under the more exacting three-prong emergency aid exception. He bases his claims upon Part I, Article 19 of the New Hampshire Constitution only.

The State counters that the trial court properly found that Davis' stop of the defendant's car was justified under the community caretaking exception. The State does not argue on appeal that the emergency aid exception also justifies the stop.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's findings unless they lack support in the record or are clearly erroneous. *State v. Licks*, 154 N.H. 491, 492 (2006). Our review of the trial court's legal conclusions, however, is *de novo. Id.*

Part I, Article 19 of the New Hampshire Constitution protects against unreasonable searches and seizures. N.H. CONST. pt. I, art. 19. Under Part I, Article 19, all warrantless searches and seizures are *per se* unreasonable, unless they fall within the narrow confines of a judicially crafted exception. *State v. Boyle*, 148 N.H. 306, 307 (2002). The State bears the burden of establishing that a seizure falls within one of these exceptions. *Id.*

 We first recognized the community caretaking exception to the warrant requirement in *State v. Psomiades*, 139 N.H. 480, 482 (1995). We held that it applies to the seizure of property "when [the seizure] constitutes no more than a routine and good faith attempt, in the exercise of reasonable caution, to safeguard the defendant's own property." *Id.* (quotation omitted). In *State v. Boyle*, we explained that in order to justify a seizure under the community caretaking exception, the police officer

> must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. We judge these facts by an objective standard: would the facts available to the officer at the moment of

> the seizure warrant a person of reasonable caution to believe that the action taken was appropriate.

*Boyle*, 148 N.H. at 308 (quotation and citation omitted). To determine whether the grounds for a particular seizure meet constitutional requirements, we balance the governmental interest that allegedly justified it against the extent of the intrusion on protected interests. *Id.* Finally, to be valid under the community caretaking exception, the seizure must be totally separate from the detection, investigation or acquisition of evidence relating to a criminal matter. *Id.*; *cf. State v. D'Amour*, 150 N.H. 122 (2003) (separation of community caretaking function from investigation of criminal matter need not be of a temporal or spatial nature).

■ We are not persuaded by the defendant's argument that the community caretaking exception should not apply to the stop of a moving vehicle. We previously upheld the stop of a motorist on grounds similar to what is now known as the community caretaking exception. In *State v. Maynard*, 114 N.H. 525 (1974), a police officer stopped a motorist whose erratic driving led the officer to believe he was suffering from a health problem. *Id.* at 526. We upheld the stop, stating:

> Certainly if officers may in good faith conduct a road check for the purpose of determining the fitness of drivers, they may so do when they in good faith reasonably believe that the driver of a particular vehicle may be ill and physically unfit to drive. The key, however, is whether the officer acted reasonably and in good faith and not by subterfuge to obtain evidence of a crime.

*Id.* at 527.

Additionally, courts in other states have recognized that the police may stop a moving vehicle as part of the community caretaking function. *See United States v. Touzel*, 409 F. Supp. 2d 511, 519 (D. Vt. 2006) (decision to stop defendant's car, warn him that the road ahead was icy and that power lines were down, and direct him to turn around was "unquestionably a valid exercise of the community caretaking function"); *State v. Harrison*, 533 P.2d 1143, 1144 (Ariz. 1975) (stop justified by officer's observation that car's tire was "bouncing"). We see no reason to retreat from *Maynard*.

Although we reject the defendant's argument that the community caretaking exception should not apply to the stop of a moving vehicle, we nonetheless conclude that in this case, the motor vehicle stop was not justified under the community caretaking exception to the warrant requirement.

■ The facts demonstrate that heavy rains had caused some flooding in the ditches alongside Roland Town Road, and Chief Davis and a highway agent were parked in the middle of the road attempting to discern where the water was coming from. However, Davis neither activated the lights on his cruiser, nor set up flares or other warning signals to alert oncoming drivers of the flooding in the ditches. Moreover, there was no evidence of additional flooding further up the road. When the defendant's car approached Davis' cruiser, Davis made no effort to stop it from passing his cruiser until the defendant had already driven part way around the cruiser through the water, and Davis had recognized him as the driver. When Davis spoke with the defendant, he was standing on dry road, and there is scant evidence to suggest that there was at that point any danger to the defendant's vehicle. Indeed, after speaking with the defendant and discerning that he was operating under a suspended license, Davis was called to assist with an emergency, and permitted the defendant to drive himself home, testifying that there was no emergency at that point.

These facts lead us to conclude that the stop was not justifiable as a routine and good faith attempt to safeguard the defendant's property. *Boyle*, 148 N.H. at 307. Accordingly, we reverse the trial court's ruling on the motion to suppress, and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

DALIANIS, GALWAY and HICKS, JJ., concurred.