Rockingham
No. 2008-494

THE STATE OF NEW HAMPSHIRE

v.

SHEILA K. LABARRE

Argued: January 13, 2010
Opinion Issued: March 25, 2010

*Michael A. Delaney*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Sheila LaBarre, was convicted of the first-degree murders of Kenneth Countie and Michael DeLoge, *see* RSA 630:1-a (2007), following a jury trial in the Superior Court (*Nadeau*, J.). She appeals, arguing that the trial court erred by admitting certain evidence. We affirm.

I

The record supports the following. On February 24, 2006, Sergeant Shawn Gallagher of the Epping Police Department received two phone calls from the family of Kenneth Countie. They reported that their son had been taken from Wilmington, Massachusetts, by the defendant. Gallagher knew the defendant, having dealt with her approximately two dozen times since 1995.

Gallagher confirmed through the National Crime Information Center (NCIC) that the Wilmington Police Department listed Countie as a missing person. At around 1:00 p.m., Gallagher and Detective Richard Cote went to the defendant's home in Epping to check on Countie.

The defendant's home was located on Red Oak Hill Lane, a public dirt road. The road continued through the defendant's property, although there was a gate in front of the defendant's home, that, when closed, blocked the road. On her property were a single-family dwelling with a barn, outbuildings, and pastureland. Her property was bordered by a fence, barbed wire, and the gate between her property and the road.

When the officers arrived at the defendant's home, the gate was closed. They parked their cruiser outside the gate, and climbed through the gate's rungs. They walked to the door and spoke with the defendant through a window. Gallagher asked if Countie was there, and the defendant said he was not. Gallagher told the defendant they had an NCIC report from Wilmington and asked again if Countie was present. The defendant then admitted he was. Gallagher asked if they could see Countie to check on his well-being. The defendant initially refused, saying Countie was naked and in the bathtub. She then left the window, however, and brought Countie to the door. Gallagher testified that Countie appeared "fine" and told the officers that he was there of his own free will. The defendant told the officers to leave her property, which they did.

On February 26, 2006, the defendant made three phone calls to Gallagher, stating that the police had no right to go onto her property, requesting a copy of the NCIC report that listed Countie as a missing person, and threatening to sue anyone who went onto her property again.

On March 17, 2006, Gallagher and Cote responded to a call that a suspicious person was acting disruptively inside the Wal-Mart Supercenter in Epping. When they arrived, they found the defendant with Countie, who was slumped over in a wheelchair. Countie's skin was ashen, he had cuts on his face and hands, and one of his hands was swollen and not functioning normally. The defendant told Gallagher that Countie received his injuries in a car accident. When Cote attempted to speak with Countie, the defendant told Countie not to say anything to him. The officers accompanied the defendant and Countie out of the store, and Gallagher observed that

Countie was leaning on a shopping cart and "not walking properly." The defendant helped Countie into her truck.

On March 22, 2006, the defendant called Gallagher to complain that he had characterized her as a "suspicious person" in his report about the Wal-Mart incident. She also told him that Countie had left her house. The next day, Countie's mother called Gallagher. She said she was concerned because the defendant had stated that Countie was no longer living with her, and Countie would have contacted someone if he were on his own. She also told Gallagher that her son could not be on his own because he had some "mental deficiencies since birth." Gallagher and Cote called the defendant several times and left messages to find out where Countie was.

At approximately 1:00 a.m. on March 24, 2006, the defendant called Gallagher. She told him that Countie had left and then played a tape recording over the phone. On the tape, the defendant identified herself as a justice of the peace in New Hampshire and questioned Countie about raping children. Countie replied "yes" to the defendant's questions in a soft, muffled voice. At the end of the tape, Gallagher heard a heaving sound, and the defendant told Countie to stop faking that he was "throwing up." Then on the tape she said, "Kenneth Countie is now faking that he's throwing up." Shortly thereafter the defendant told Countie to stop faking that he fainted, and then said, "Kenneth Countie is now faking that he fainted." While this tape was playing, Gallagher heard the defendant in the background "crying hysterically," and saying "why, why, why?" Then the tape ended.

Concerned for Countie's safety, Gallagher and Cote went to the defendant's home at 6:00 p.m. Although the defendant had told them Countie was gone, the police went to her residence because in the past, she had had domestic disputes and told the police that the person had left, but the police later found the person there. When they arrived, the gate was closed but not locked. There were no lights on in the house and all of the defendant's vehicles were parked in her yard. From outside the gate, Gallagher saw a burnt mattress in the front yard.

Gallagher and Cote climbed through the rungs of the gate and began walking toward the house. They passed the burnt mattress and a second burn pile. Using a flashlight to illuminate the pile, they saw what appeared to be a knife handle with a melted blade, tree limb clippers, a partially burnt chair, and a piece of bone. The bone was approximately three and a half inches long with a large piece of fleshy material attached to it.

The officers walked to the door and knocked several times, identifying themselves as Epping police officers. No one answered the door, so they returned to their cruiser. Gallagher was concerned that the bone was part

of Countie's remains. Gallagher called an assistant county attorney who told him he had sufficient evidence to conduct a "well-being check" concerning Countie.

Cote called for assistance and Officer Bradley Jardis responded. Officer Jardis took his patrol rifle from his cruiser and carried it pointing down in an "administrative carry," and the three officers walked to the home. Gallagher knocked on the door while the other two officers banged on the side of the house and windows. When no one responded, they went back to the door and Gallagher kicked it open. Simultaneously, Gallagher heard a commotion and saw the defendant walking from the gate toward them.

The defendant told the officers that Countie was not there. Gallagher asked if they could go inside to check. The defendant invited them in and gave the officers a room-by-room tour of the house. Gallagher testified that she seemed "happy" as she gave the tour. In the basement, the officers found a pair of sneakers that the defendant said belonged to Countie. She told the officers they could not take them.

After the tour, the defendant and the officers walked outside. Cote asked the defendant about the bone. The defendant replied that it was from a rabbit and explained that she usually cremated her rabbits. When Cote observed that the bone was too big to have come from a rabbit, the defendant became agitated and said that it was from either "a rabbit or a pedophile." Gallagher asked her why she said it was from a pedophile and the defendant denied that she had said that. The officers asked if they could take the bone, but the defendant refused. The defendant asked them to leave, which they did.

Based upon his observations on March 24, Gallagher obtained a warrant to search the exterior of the defendant's home. Officers from the Epping Police Department and the New Hampshire State Police executed the search warrant on the morning of March 25, 2006. They seized several items and interviewed the defendant, who signed a consent-to-search form for her home.

On March 27, 2006, the defendant was interviewed by Sergeant Robert Estabrook and Chief Gregory Dodge of the Epping Police Department. During the interview, the defendant discussed the events of March 24. She told the officers that when she arrived home that night she found the police were already there and she let them inside her home. She described Officer Jardis as being quiet and did not mention he was carrying his firearm. At the end of the interview, she was released.

Before trial, the defendant moved to suppress the physical evidence seized during searches of her home and property. She argued that the officers' entries onto her property on February 24, 2006, and March 24, 2006, violated her state and federal constitutional rights to be free from

unreasonable searches and seizures because the police entered her property without a warrant and no exceptions to the warrant requirement applied.

After a two-day evidentiary hearing, the court denied the motion. The court found that because the police "neither entered nor searched the defendant's home" on February 24, the police did not violate the defendant's constitutional rights. The court also found that the community caretaking and emergency aid doctrines justified the March 24 entry. The court further concluded that the "defendant freely, knowingly, and voluntarily consented to the search of her home."

The defendant was indicted on one count of first-degree murder for the death of Kenneth Countie. She entered a non-negotiated plea of not guilty by reason of insanity and filed a notice of insanity defense. At the same time, she waived indictment and pleaded not guilty by reason of insanity to first-degree murder for the death of Michael DeLoge. The jury found her sane and guilty of both charges. This appeal followed.

On appeal, the defendant does not challenge the police entry onto her property on February 24. She argues, however, that the trial court erred in finding the officers' actions on March 24 were justified under either the community caretaking or emergency aid exceptions to the warrant requirement. She also challenges the trial court's finding that she voluntarily consented to the officers' entry of her home that night. The State contends that the defendant waived her right to challenge the denial of her motion to suppress by pleading not guilty by reason of insanity and foregoing the guilt phase of the trial. Alternatively, the State argues that the community caretaking and emergency aid exceptions apply, and the defendant consented to the search of her home. We hold that the defendant did not waive her right to appeal, but that the search on March 24 was justified by the police's community caretaking function and the defendant's consent.

## II

We first address the State's argument that the defendant waived her right to appeal the trial court's ruling on her motion to suppress. The State relies upon the acknowledgment and waiver of rights form the defendant signed before pleading not guilty by reason of insanity and the plea colloquy. Specifically, the State points to language in the acknowledgment of rights form which lists the constitutional rights a defendant gives up by pleading guilty, including the "RIGHT to appeal, if convicted."

The defendant argues that she did not waive this right. Before she signed the form, defense counsel altered the form to clarify that the defendant was pleading "not GUILTY by reason of insanity" and that the waiver of rights was specifically limited to "the non-insanity issues/phase only." Therefore,

the defendant argues that she did not waive her right to appeal the admissibility of the evidence the State introduced to prove she was sane at the time she committed the murders. We agree.

■ When a defendant in a criminal case waives the right to appeal, it must be knowing and intelligent. *See, e.g., United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004), *cert. denied*, 129 S. Ct. 212 (2008); *United States v. Andis*, 333 F.3d 886, 890 (8th Cir.), *cert. denied*, 540 U.S. 997 (2003); *United States v. Khattak*, 273 F.3d 557, 561 (3d Cir. 2001). A knowing and intelligent waiver must be clear and unambiguous. *See United States. v. Jones*, 381 F.3d 615, 619 (7th Cir. 2004).

■ Here, the defendant's waiver of her right to appeal was not unambiguous. The defendant's alteration of the waiver form conveyed her intent to waive only the rights associated with the non-insanity or guilt phase. The motion to suppress, however, concerned evidence that was relevant to both the guilt and sanity phases of the trial. Accordingly, the defendant's waiver of her right to appeal issues related to the guilt phase of the trial was insufficient to waive her right to appeal the trial court's ruling on the motion to suppress. In addition, at the plea hearing there was no discussion by the court, and no acknowledgment by the defendant, that she was in any way giving up her right to appeal the ruling on the motion to suppress. Therefore, we cannot conclude that the defendant waived her right to appeal the trial court's ruling on her motion to suppress.

## III

Next, we address the defendant's argument that the trial court should have suppressed the evidence and statements the police gathered as a result of an illegal search of her property. *See* N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV. "Our review of the superior court's order on a motion to suppress is *de novo*, except as to any controlling facts determined by the superior court." *State v. Denoncourt*, 149 N.H. 308, 309 (2003). We first address the defendant's claim under the New Hampshire Constitution, citing federal cases only to aid in our analysis. *See State v. Ball*, 124 N.H. 226, 232 (1983).

■ Part I, Article 19 of the New Hampshire Constitution protects against unreasonable searches and seizures. "Under Part I, Article 19, . . . warrantless searches are *per se* unreasonable unless they fall within the narrow confines of a judicially crafted exception." *Denoncourt*, 149 N.H. at 310. The State bears the burden of establishing that a search falls within one of these exceptions. *Id.* Here, the trial court found that the officers'

warrantless search of the defendant's property on March 24 was justified by the community caretaking exception to the warrant requirement. We agree.

We first adopted the community caretaking exception to the warrant requirement in *State v. Psomiades*, 139 N.H. 480, 482 (1995). "Separate and apart from conducting criminal investigations," police engage in community caretaking functions such as "helping stranded motorists, returning lost children to anxious parents, [and] assisting and protecting citizens in need." *State v. Seavey*, 147 N.H. 304, 311 (2001) (Duggan, J. dissenting) (quotation omitted). "Evidence found in the course of caretaking activities is usually admissible at trial." *Denoncourt*, 149 N.H. at 310.

We explained in *State v. Boyle* that, to justify a search under the community caretaking exception, the police officer

must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. We judge these facts by an objective standard: would the facts available to the officer at the moment of the seizure warrant a person of reasonable caution to believe that the action taken was appropriate.

*State v. Boyle*, 148 N.H. 306, 308 (2002) (quotation and citation omitted). "To determine whether the grounds for a particular [search] meet constitutional requirements, we balance the governmental interest that allegedly justified it against the extent of the intrusion on protected interests." *State v. Craveiro*, 155 N.H. 423, 427 (2007). "[T]he [search] must be totally separate from the detection, investigation or acquisition of evidence relating to a criminal matter." *Id.*; *cf. State v. D'Amour*, 150 N.H. 122, 126 (2003) (separation of community caretaking function from investigation of criminal matter "need only relate to a sound and independent basis for each role").

The circumstances in this case justified police entry onto the defendant's property under the community caretaking exception. Countie's family made numerous phone calls to the Epping Police Department indicating concern for his safety because Countie could not care for himself. When the officers first met Countie on February 24, he appeared fine, but when they saw him on March 17, he was visibly injured. Furthermore, Countie's mother stated that the defendant told her that Countie had left the defendant's home to go to Massachusetts but he had not contacted his family, which was unusual for him.

The events of March 24 reinforced the possibility that Countie was injured. In the defendant's phone call at 1:00 a.m., Countie could be heard

vomiting on the audio tape and the defendant said he had fainted. Although the defendant told the officers and Countie's family that he had left, the police had reason to believe she was lying. She had previously lied to the police when they went to her home on February 24 to see if Countie was there. The defendant initially told them he was not there but then brought him to the door. The officers also knew that the defendant had a history of arguing with partners who left her home but returned later. All of these facts were enough to cause "a person of reasonable caution" to believe that Countie might have been injured and at the defendant's residence. *See Boyle*, 148 N.H. at 308.

The record also demonstrates that the police entered the defendant's property to check on Countie's well-being, not to investigate a crime. When they pulled up to the defendant's gate on March 24, they had no reason to suspect that a crime had been committed. *D'Amour*, 150 N.H. at 126. Given the circumstances outlined above, however, the police had reason to believe that Countie could be injured. The officers' concerns for Countie's well-being, and the likelihood that he was still at the defendant's home, outweighed the intrusion onto the defendant's property. *See Craveiro*, 155 N.H. at 427. Therefore, police entry onto the defendant's property on March 24 was justified under the community caretaking exception to the warrant requirement.

Because we find that the officers' actions were justified under the community caretaking exception we need not consider the State's argument that the emergency aid exception applied. We also need not address the State's argument that the police were justified in forcibly opening the door to the defendant's home under the community caretaking exception because the police did not enter the defendant's home at that point and their actions did not lead to the seizure of any evidence.

## IV

We next consider whether the defendant consented to the officers' entry into her home on March 24. The defendant argues her consent was invalid because: (1) her consent was vitiated by the unlawful police entry onto her property; and (2) she was intimidated by the three officers, one with a gun, who had just forcibly opened her door. As discussed above, however, her first argument fails because the entry was lawful. The State counters that the defendant's interactions with the police that evening demonstrate that she voluntarily consented to the search of her house. We agree.

■ Like community caretaking, a "voluntary consent free of duress and coercion is a recognized exception to the need of both a warrant and probable cause." *State v. Johnston*, 150 N.H. 448, 453 (2004) (quotation omitted). The State must prove, by a preponderance of the evidence, that

the defendant's "consent was free, knowing and voluntary." *Id.* "Voluntariness is a question of fact, based on the totality of the circumstances." *State v. Watson*, 151 N.H. 537, 540 (2004). "We will disturb the trial court's finding of consent only if it is not supported by the record." *Id.*

The trial court concluded that the evidence "show[ed] that the defendant was not . . . threatened, frightened, intimidated or coerced into giving consent." This finding is supported by the record. Gallagher testified that Officer Jardis "held the weapon in an administrative carry, pointing at the ground," and the defendant described Jardis as "quiet" in her interview with police on March 27. Moreover, in that same interview, the defendant told Dodge that she "let [the officers] in." Finally, when Gallagher stood with the defendant on the porch and she said Countie was not there, he asked her if the officers could go inside and check. The defendant, without hesitation, invited them in.

In addition, the defendant was familiar with the police and the officers testified that she had been assertive with them in the past. On March 24, the defendant refused to let the police take Countie's sneakers or the bone from the burn pile, and when the defendant told the police to leave, they did. Based upon the totality of the circumstances, we hold that the trial court did not err in ruling that the defendant freely, knowingly and voluntarily consented to the search of her home. Accordingly, the trial court's finding that the defendant consented to the search of her home is supported by the record and will not be disturbed. *Watson*, 151 N.H. at 540.

Because the State Constitution provides at least as much protection as the Federal Constitution under these circumstances, *see Boyle*, 148 N.H. at 307, we reach the same result under the Federal Constitution as we do under the State Constitution.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.