NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2020-0404

THE STATE OF NEW HAMPSHIRE

v.

COREY V. DONOVAN

Argued: April 14, 2022
Opinion Issued: August 12, 2022

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Zachary L. Higham, assistant attorney general, on the brief and orally), for the State.

Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Corey V. Donovan, appeals his conviction on a single felony count of possession of a controlled substance. See RSA 318-B:2, I (2017). On appeal, he argues that the Trial Court (McNamara, J.) erred by denying his motion to suppress. We reverse and remand.

The trial court found or the record contains sufficient evidence for the trial court to have found the following facts. See State v. Palermo, 168 N.H. 387, 394 (2015) ("[W]e must assume that the trial court made subsidiary

findings necessary to support its general ruling." (quotation omitted)). On the morning in question, four police officers, Chief Mahoney from Andover, Chief Suckling and Sergeant Marvin from Danbury, and Chief Williamson from Hill, responded to a call that two people either were passed out or sleeping in a green Jeep at the Circle K in Andover. Before arriving on the scene, Mahoney was informed that the Jeep was registered to the defendant, who had a valid driver's license and was on federal probation. When they arrived, the officers saw the Jeep parked in front of the entrance to the Circle K. Mahoney parked his cruiser some distance behind the Jeep and the other officers parked their vehicles either behind Mahoney's cruiser or in the same general area.

The four officers approached the Jeep and attempted to look inside it before waking the defendant and his passenger. After the police had been on the scene for approximately two minutes, they roused the defendant. The defendant gave Mahoney his license and registration, which Mahoney took back to his cruiser. Mahoney then called dispatch to run a criminal records check on the defendant.

When the defendant's passenger awoke, Suckling asked her to exit the vehicle. Once she did so, Williamson observed a black case inside the Jeep. Williamson approached Mahoney's cruiser and told him that there was a black case inside the Jeep, which he identified as a "Flambeau" rifle case.

Williamson returned to the passenger side of the Jeep and told Suckling about the rifle case, who viewed it and then asked the defendant about it. The defendant told Suckling that the case contained a guitar. After Mahoney verified from dispatch that the defendant was a convicted felon, he decided to impound the vehicle and obtain a warrant to search it. Shortly thereafter, Marvin, who was standing next to the driver's side of the Jeep, saw a large, sheathed machete between the driver's seat and the door. He reached into the Jeep, grabbed the sheathed machete and tossed it to Williamson. The defendant was then ordered out of the vehicle and placed under arrest. During a search of the defendant's person incident to the arrest, Williamson found a large bundle of cash in the defendant's pocket inside of which was a small, clear bag containing a controlled drug.

After the police took the defendant into custody, they obtained warrants to search the vehicle and the rifle case. Several firearms were found inside the rifle case. The defendant was eventually indicted on several felonies, including four counts of being a felon in possession of a deadly weapon and one count of felony possession of a controlled drug.

Before trial, the defendant filed a motion to suppress all evidence about the rifle case and controlled drug, arguing that this evidence was "the fruit[] of an illegal seizure." He asserted that he was seized "at the very least when [the police] ordered his passenger to exit the vehicle" because, at that point, "[n]o

reasonable person would [have felt] that they were free to leave." He argued that the police lacked reasonable suspicion to justify this investigatory stop. The defendant reasoned that because the officers "only observed the machete and the [rifle] case after they had illegally seized [him]" and because the officers "discovered the [controlled drug] only after illegally arresting him," the machete, the controlled drug, the rifle case, and his statements about the same "must all be suppressed."

The State did not counter the defendant's assertion that he was seized, at the latest, when the police ordered his passenger to exit the vehicle. Nor did the State set forth reasonable, articulable suspicion to justify such a seizure. Instead, the State asserted that the investigatory stop was not impermissibly expanded or prolonged. The State argued that the police asked the defendant about the rifle case based upon their reasonable and articulable suspicion that he was a felon in possession of a deadly weapon.

At the two-day hearing on the motion to suppress, the State conceded that "it is clear from the [officers'] testimony that [the defendant] and his passenger were not free to leave." Indeed, three of the four officers testified that once Mahoney took the defendant's license and registration back to his cruiser and the passenger was asked to exit the vehicle, the defendant was not free to leave. The fourth officer, Williamson, was not asked the question. However, in its closing argument, the State did not set forth any reasonable, articulable suspicion to justify a seizure. Rather, the State argued that "[a]ny questioning" of the defendant "did not exceed the scope of the initial stop" because "[t]he questions asked were all related to the reasons why [the defendant and his passenger] were there until . . . this gun case[] [is] observed." Defense counsel countered that "in this case, unlike the vast majority of stops that we're talking about, there is no reason for the stop. There is no crime that [the police] believe that these individuals have committed until we talk about the gun case." Defense counsel explained,

> So I think it is inappropriate to suggest that the questioning was appropriate because it was related to the reasons for [the defendant and his passenger] to be there. [The police] don't get to stop these people. They don't get to order [the passenger] out of the car until they have some sort of reason to do that. And not one of them has articulated anything that these people have done wrong up until the point when [the police] see the case.

The trial court denied the defendant's motion to suppress. However, like the State, the court neither identified the point at which the defendant first became subject to an investigatory stop nor set forth the reasonable, articulable suspicion that supported the stop.

3

The defendant unsuccessfully moved for reconsideration. Following a four-day jury trial, the jury found the defendant guilty of possession of a controlled drug, but not guilty of the other charges. He was sentenced to 12 months in the county house of corrections, suspended for three years. This appeal followed.

On appeal, the defendant argues under both the State and Federal Constitutions that the trial court erred "[b]y ruling that he was not seized" before the police observed the rifle case. When reviewing a trial court's determination of whether a seizure occurred, we accept its factual findings unless the record does not support them or they are clearly erroneous. State v. Jones, 172 N.H. 774, 776 (2020). We review the trial court's determination regarding whether a seizure occurred de novo. Id. We first consider the defendant's argument under the State Constitution and cite federal opinions for guidance only. State v. Ball, 124 N.H. 226, 231-33 (1983).

Part I, Article 19 of the New Hampshire Constitution protects individuals from unreasonable seizures. Jones, 172 N.H. at 777. "A warrantless seizure is per se unreasonable unless it falls within a recognized exception to the warrant requirement." State v. McInnis, 169 N.H. 565, 569 (2017) (quotation omitted). "The State bears the burden of establishing that a seizure falls within one of these exceptions." State v. Craveiro, 155 N.H. 423, 426 (2007).

"An investigatory stop based upon reasonable suspicion is such an exception." McInnis, 169 N.H. at 569. "In order for a police officer to undertake an investigatory stop, the officer must have a reasonable suspicion, based upon specific, articulable facts taken together with rational inferences from those facts, that the particular person stopped has been, is, or is about to be, engaged in criminal activity." State v. Turmel, 150 N.H. 377, 380 (2003); see Terry v. Ohio, 392 U.S. 1, 20-21 (1968). To determine whether an officer made a lawful investigatory stop, we conduct a two-step inquiry: first, we determine when the defendant was seized; second, we determine whether, at that time, the officer possessed a reasonable suspicion that the defendant was, had been or was about to be engaged in criminal activity. McInnis, 169 N.H. at 569.

"Not all personal interactions between police and citizens involve seizures of persons." Id. (quotation omitted). "Indeed, a seizure does not occur simply because a police officer approaches an individual and asks a few questions, or asks to examine the individual's identification." Id. at 569-70 (quotation omitted). Rather, "[a]n interaction becomes a seizure . . . when a reasonable person would no longer believe he or she is free to leave." Id. at 570 (quotation omitted).

4

"In practice, there is some tension between the . . . 'free to leave' test and [the] sanctioning of these suspicionless police-civilian encounters," United States v. Tanguay, 918 F.3d 1, 5 (1st Cir. 2019), because, as we have recognized, "as a practical matter, citizens almost never feel free to end an encounter initiated by the police," Jones, 172 N.H. at 777 (quotation omitted). We resolve this tension by focusing upon whether "an officer, by means of physical force or show of authority, has in some way restrained the liberty of the person." McInnis, 169 N.H. at 570 (quotation omitted). "Circumstances indicating a show of authority might include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. (quotation omitted). Although "mere requests to communicate generally do not amount to an official show of authority, the police may not convey a message that compliance with their requests is required." Id. (quotation omitted).

Our analysis is objective, focusing upon "whether the defendant's freedom of movement was sufficiently curtailed by considering how a reasonable person in the defendant's position would have understood his situation." Id. (quotation omitted). When assessing whether a seizure occurred, we consider all of the circumstances surrounding the encounter, and no single factor is dispositive. Jones, 172 N.H. at 777.

Here, we conclude that the defendant was seized before the rifle case was observed and identified. The record, which includes video footage of a body camera worn by Williamson, establishes that before the rifle case was observed: four officers driving four separate cruisers approached the defendant's vehicle; at least three of the four responding officers were in uniform and were armed; Mahoney took the defendant's license and registration back to his cruiser and ran a criminal records check on him; and the defendant's passenger was asked to exit the vehicle. Although, as the trial court found, the defendant's vehicle "was not blocked by any police cruiser," in that he could have backed the Jeep out of its parking space and driven away, the body camera video footage establishes that the placement of the cruisers impeded his ability to do so.

All of these circumstances objectively communicated to the defendant that his compliance with the officers' requests was compelled. As we have previously observed, although an individual is not seized merely because an officer asks to examine his identification, "[a]n officer could . . . objectively communicate a show of authority rising to the level of a seizure if the officer retains possession of [the] individual's identification, because a reasonable person would not feel free to terminate the encounter under such circumstances." Id. at 779; see McInnis, 169 N.H. at 570 (determining that the defendant was not seized where, among other circumstances, the officer did not obtain the defendant's identification documents). Here, not only did the police retain the defendant's license and registration, but they also separated

him from his passenger.  We conclude that a reasonable person in the defendant's position would not have felt free to leave or terminate the encounter under these circumstances, and that, therefore, the defendant was seized, at the latest, when his passenger was asked to exit the vehicle.  See McInnis, 169 N.H. at 570.

The State does not argue that the officers possessed reasonable suspicion to seize the defendant before the rifle case was observed and identified.  See Jones, 172 N.H. at 781.  Rather, the State argues that "[e]ven if the interaction between the police and the defendant developed into an investigatory stop, the stop was lawful" under a different exception to the warrant requirement, the community caretaking exception.  See Craveiro, 155 N.H. at 426-27 (explaining the community caretaking exception to the warrant requirement and holding that the exception applies to the stop of a moving vehicle).  The State urges us to uphold the trial court on this alternative ground.

However, the State concedes that it did not rely upon the community caretaking exception to the warrant requirement in the trial court.  Because the State did not argue in the trial court that any seizure of the defendant before the rifle case was observed and identified was lawful under the community caretaking exception to the warrant requirement, we decline to address the argument on appeal.  See State v. Santana, 133 N.H. 798, 807-09 (1991) (declining to address the State's assertion that, even if the warrantless entry was unconstitutional, the seized evidence should not be suppressed pursuant to the independent source doctrine because the State "never identified for the trial court the 'independent source doctrine' as a ground justifying the admission of the evidence").

For all of the above reasons, we conclude that the defendant's seizure violated his rights under Part I, Article 19 of the State Constitution and that the trial court erred by denying his motion to suppress.  See Jones, 172 N.H. at 781.  Because the defendant prevails under the State Constitution, we need not decide whether he also prevails under the Federal Constitution.  See id.

Reversed and remanded.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.