Rockingham
No. 2010-564

THE STATE OF NEW HAMPSHIRE

v.

KRISTIN RUGGIERO

Argued: September 21, 2011
Opinion Issued: December 28, 2011

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Sisti Law Offices*, of Chichester (*Mark L. Sisti* on the brief and orally), for the defendant.

CONBOY, J. After a jury trial in Superior Court (*McHugh*, J.), the defendant, Kristin Ruggiero, was convicted of twelve counts of falsifying physical evidence, RSA 641:6, II (2007), and one count of false report, RSA 641:4, I (2007). On appeal, she argues that the trial court erred: (1) in refusing to exclude certain audio/video recordings as violative of New

Hamphire's wiretap statute; (2) in allowing into evidence, without proper authentication, certain e-mail messages she purportedly sent; and (3) in denying her motion to dismiss for insufficient evidence. We affirm.

The jury could have found the following facts. The defendant married Jeffrey Ruggiero (Jeffrey) in August 2001. In 2007, divorce proceedings commenced. In November 2007, the defendant obtained a new job with Pet DRx, and she and her boyfriend, Brendan Bisbee (Brendan), relocated to San Jose, California. In 2007, Jeffrey, a member of the United States Coast Guard, was stationed in Charleston, South Carolina. While in South Carolina, Jeffrey met Jean Backus (Jean).

Shortly before the divorce action commenced, the defendant filed a domestic violence petition against Jeffrey. The Brentwood Family Division (*LeFrancois*, J.) issued a restraining order against Jeffrey, prohibiting him from engaging in any contact with the defendant. After the restraining order issued, Jeffrey initiated no further contact with the defendant.

The defendant, however, contacted Jeffrey and Jean in South Carolina through text messages, telephone calls and e-mails. Jeffrey also received anonymous text messages from "811.com," as well as telephone calls from "843-298-1057" (the "1057 phone"), a prepaid T-Mobile cellular telephone. Although Jeffrey and Jean did not recognize the 1057 number, they recognized the caller's voice as the defendant's. On several occasions, Jean used a video camera to capture the image of the 1057 number on Jeffrey's cell phone screen and to record the defendant's voice. Later investigation of the 1057 number revealed that the person who activated the telephone did not supply an address, but did provide the name "Jeffrey" and Jeffrey's birth date during activation. As a result of the defendant's repeated contact, Jeffrey changed his cell phone number several times, but he continued to receive communications from the defendant.

In December 2007, Jeffrey was charged with certain offenses relating to violation of the restraining order. After a district court trial in April 2008, he was found guilty, but sentencing was delayed pending completion of a pre-sentence investigation report. The defendant was upset that Jeffrey was not jailed immediately after his conviction, and claimed she was "terrified" that he might kill her. Eventually, Jeffrey was sentenced to a term in jail.

On May 4, 2008, within a thirty-minute period, twelve text messages were sent from the 1057 phone to "617-833-9495," the defendant's Verizon Wireless cell phone number. Shortly after receiving the last text message, the defendant called the police from her parents' home in East Kingston and reported that Jeffrey had violated the restraining order against him. East Kingston Police Officer Iannuccillo was dispatched.

After Officer Iannuccillo arrived at the house, the defendant gave him a handwritten log of the text messages she claimed Jeffrey sent her from the 1057 phone. Officer Iannuccillo called the 1057 number, but received a computer-generated voicemail message. Because the defendant expressed fear that Jeffrey might be in New Hampshire, the officer tried to locate him, but was unsuccessful. The next day, after further investigation by Police Chief Simpson, Jeffrey was located in South Carolina. He denied violating the restraining order. After additional investigation, Chief Simpson obtained an arrest warrant for Jeffrey.

Following the May 4 incident, the defendant sent several e-mails to a number of people including her divorce attorney, Attorney Linda Theroux, Kingston prosecutor, Attorney Heather Newell, Assistant Attorney General Lucy Carrillo, and various Coast Guard officials. The e-mails reiterated her allegations about the May 4 text messages and sought assistance in pursuing her case against Jeffrey.

In July 2008, Jean sent Chief Simpson three packages containing "a CD video disk, some e-mails, police reports and . . . pictures." Jeffrey and Jean also authorized Chief Simpson to access their online cell phone accounts. Chief Simpson recognized the 1057 number in the video recordings from Jean as the same number from which the defendant allegedly received the twelve May 4 text messages. After further investigation, including searches of cell phone tower locations, additional records for the 1057 phone, and the defendant's travel records, a warrant was issued for the defendant's arrest in September 2008. The warrant against Jeffrey was rescinded, and his April 2008 conviction was later vacated.

Prior to trial, the defendant moved, *in limine*, to exclude the videotaped recordings Jean provided to Chief Simpson. The trial court denied the motion. During her trial, the defendant also objected to the admission of certain e-mail messages, arguing that the State failed to properly authenticate them. Finally, at the close of the State's evidence, and again at the close of all of the evidence, the defendant moved to dismiss the charges, contesting the sufficiency of the evidence. The trial court denied her motions. This appeal followed.

## I. The Audio/Video Recordings

The defendant first argues that the trial court erred when it admitted the audio/video recordings of the 1057 number evidencing the telephone calls she allegedly made to Jeffrey. Relying on *State v. Lynch*, 969 P.2d 920 (Mont. 1998), the defendant contends that the trial court should have conducted a choice-of-law analysis to determine whether New Hampshire law or South Carolina law governed the admissibility of the recordings. The

defendant asserts that had the trial court done so, it would have concluded that New Hampshire law controls, and the recordings would have been inadmissible under RSA 570-A:6 (2001) (prohibiting admission at trial of intercepted telecommunication and oral communication, or evidence derived therefrom, where disclosure of such information would violate the wiretap statute). The defendant argues that the admissions violated her due process rights under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The State maintains, however, that the defendant's choice-of-law argument is irrelevant because the recording took place in South Carolina, where the interception was legal. We note that the parties agree that the audio/video recorded phone calls were lawfully intercepted in South Carolina. *See Mays v. Mays*, 229 S.E.2d 725, 726 (S.C. 1976).

The question presented is whether telephonic evidence that is legally obtained in a sister state by a citizen thereof is admissible in a New Hampshire court proceeding where such evidence would not be admissible if it had been obtained in New Hampshire. This question is one of first impression in New Hampshire, which we review *de novo. See State v. Addison*, 161 N.H. 300, 306 (2010) ("The interpretation of a statute is a question of law, which we review *de novo.*"); *see also Lynch*, 969 P.2d at 922 ("[This question] is purely one of law over which our review is plenary.").

Courts in other jurisdictions that have considered the issue have generally employed two approaches — the exclusionary rule approach and the conflicts-of-law approach. *See State v. Schmidt*, 712 N.W.2d 530, 535 (Minn. 2006) (discussing the conflicts-of-law approaches used by other states in deciding evidentiary issues); *People v. Capolongo*, 647 N.E.2d 1286, 1293 (N.Y. 1995) (discussing the split in jurisdictions between the exclusionary rule approach and the conflicts-of-law approach); *see also* 1 W. R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 1.5(c), at 183-86 (4th ed. 2004). Jurisdictions following the exclusionary rule approach "adhere to the Federal view that the overriding purpose of the exclusionary rule is to deter unlawful governmental conduct, and that one State's laws have no deterrent effect on conduct of governmental agents of another jurisdiction." *Capolongo*, 647 N.E.2d at 1293. Alternatively, jurisdictions that conduct a conflicts-of-law analysis typically weigh the interests of the forum state against those of the sister state and assess which state has the greater interest in the process by which the evidence was obtained. *See State v. Lucas*, 372 N.W.2d 731, 736-37 (Minn. 1985).

Under the circumstances of this case, we need not decide whether to adopt the conflicts-of-law approach followed in *Lynch*, because even if we

assume the New Hampshire wiretap statute governs the admissibility of this evidence, under the plain language of the statute, there was no violation.

■ RSA chapter 570-A (Wiretapping and Eavesdropping) provides in pertinent part:

Whenever any telecommunication or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information *would be in violation of this chapter*.

RSA 570-A:6 (emphasis added). When, as here, "the language of a statute is plain and unambiguous, we need not look beyond the statute itself for further indications of legislative intent." *State v. Hill*, 146 N.H. 568, 575 (2001) (quotation omitted). Based on the plain language of the statute, evidence is excluded from trial only if its disclosure would violate New Hampshire's wiretap statute.

Pursuant to section 2 of RSA chapter 570-A, "[a] person is guilty of a class B felony if, except as otherwise specifically provided in [the] chapter or without the consent of all parties to the communication," the person either "[willfully] discloses . . . the contents of any telecommunication or oral communication, knowing or having reason to know that the information was obtained through the interception of a telecommunication or oral communication *in violation of this paragraph*," or "[w]illfully uses, or endeavors to use, the contents of any telecommunication or oral communication, knowing or having reason to know that the information was obtained through the interception of a telecommunication or oral communication *in violation of this paragraph*." RSA 570-A:2, I(c)-(d) (2001) (emphasis added).

■ Here, the interceptions did not violate RSA chapter 570-A. *See* J. CARR & P. L. BELLIA, 2 LAW OF ELECTRONIC SURVEILLANCE § 7:48, at 268 (2011) ("As a general rule, restrictions in one state's consent surveillance statute will not be given extraterritorial effect."). None of the interceptions occurred in New Hampshire. *See State v. Luv Pharmacy, Inc.*, 118 N.H. 398, 407 (1978) ("[T]he criminal law of a state or nation has no operation or effect beyond its geographical or territorial limits." (quotation omitted)). At the time the defendant made the phone calls, she was a California resident. Moreover, none of the calls to Jeffrey originated in New Hampshire. Finally, the calls were legally intercepted in South Carolina, not New Hampshire. *See* J. CARR & P. L. BELLIA, *supra* § 7:48, at 269 ("[W]hether a resident of a prohibitory state places or receives the

call, it may be recorded lawfully by the other speaker if that speaker's state permits such recording," and the recording "may be introduced into judicial proceedings in the prohibitory state."). Because disclosure of the recordings did not violate RSA chapter 570-A, the exclusionary rule of RSA 570-A:6 is inapplicable.

## II. Authentication of E-mails

Next, the defendant contends that the trial court erred by admitting four e-mail messages attributed to the defendant. At the close of all of the evidence, defense counsel argued:

> that under Rule 901, [all of the e-mail messages admitted as full exhibits] should have been authenticated by either obtaining the [e-mails] directly off [the defendant's] computer, by obtaining them from the server through which the [e-mails] were sent, or through other means of proper authentication to include, in fact, evidence that [the defendant] spoke about in e-mails and the subject matter in the [e-mails], or that someone witnessed [her] sending [e-mails].

The State maintained, however, that the e-mails were properly authenticated by testimony regarding their appearance, contents, and substance. The trial court ruled it would "adhere to [its] previous ruling and allow those exhibits." The defendant now argues that the admission of these four e-mails requires reversal.

We will assume, without deciding, that the defendant has preserved this issue for our review. "We generally review the trial court's rulings on evidentiary matters with considerable deference, and will not reverse the trial court's ruling on authentication absent an unsustainable exercise of its discretion." *State v. Knapp*, 150 N.H. 36, 37 (2003) (citation omitted). To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of her case. *N. Country Envtl. Servs. v. Town of Bethlehem*, 146 N.H. 348, 355 (2001).

New Hampshire Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The proof necessary to authenticate e-mail messages is an issue of first impression in New Hampshire. We note, however, that the federal rule of evidence is identical to our State rule, *compare* N.H. R. EV. 901 *with* FED. R. EVID. 901, and we therefore look to federal cases for guidance. *See State v. Ross*, 141 N.H. 397, 400 (1996).

■ "The bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). "The proof necessary to connect an evidentiary exhibit to a defendant may be made by circumstantial evidence." *State v. Reid*, 135 N.H. 376, 383 (1992) (quotation omitted). "The proponent need not rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Gagliardi*, 506 F.3d at 151 (quotation ómitted). The State need only demonstrate a rational basis from which to conclude that the exhibit did, in fact, belong to the defendant. *Reid*, 135 N.H. at 383. Once the evidence is admitted, "the rest is up to the jury." *Id.* (quotation omitted).

■ Like other evidence, "[e]-mail messages may be authenticated by direct or circumstantial evidence. An e-mail message's distinctive characteristics, including its contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances may be sufficient for authentication." *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 554 (D. Md. 2007) (quotations omitted); *see also* N.H. R. Ev. 901(b)(4) (examples of authentication include, "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"). Moreover, "[t]he contents of the e-mail may help show authentication by revealing details known only to the sender and the person receiving the message." *Lorraine*, 241 F.R.D. at 554 (quotation omitted). However, "[b]ecause of the potential for unauthorized transmission of e-mail messages, authentication requires testimony from a person with personal knowledge of the transmission or receipt to ensure its trustworthiness." *Id.* (quotation omitted); *see Gagliardi*, 506 F.3d at 151.

■ Here, the State sufficiently authenticated the e-mails. Regarding State's Exhibit 22 (e-mail describing the May 4, 2008 incident), Assistant Attorney General Carrillo testified that: (1) she was "CC'd" on the e-mail message; (2) the message "was from [the defendant], and . . . [it] talked about some of the issues that [Attorney Carrillo and the defendant] had talked about"; and (3) the message came from "kvpoperations@gmail.com," an e-mail address the defendant had previously used to communicate with her. The defendant testified that "kvpoperations@gmail.com" was one of her many e-mail addresses.

In addition, Attorney Newell testified about the contents of the e-mail. She explained that the reference in the e-mail to the text messages being from Jeffrey's personal cell phone number rather than an 811.com number was because they "had dealt with that issue in the past, that text messages had seemed to have come from an 811.com." She testified that State's Exhibit 22 was basically "follow up to what [the defendant] reported on May 4" to the East Kingston police.

Similarly, Attorney Carrillo testified that she received State's Exhibit 21 (e-mail regarding "BM1 Eppright") from the defendant's "kvpoperations@gmail.com" e-mail address. Attorney Carrillo "remember[ed] the substance" of the e-mail message, "that . . . a friend of Jeffrey . . . was going to, quote, 'screw [the defendant] over.' " Attorney Carrillo also identified the various recipients of the e-mail, noting that these were "the type of people that would get CC'd on a lot of these [e-mails] from [the defendant]." Additionally, Attorney Newell confirmed that she received State's Exhibit 21 and testified as to its contents.

Next, Attorney Carrillo testified that although she was not familiar with the top portion of State's Exhibit 19 (e-mail regarding alleged additional restraining order violations by Jeffrey), which contained an e-mail to Attorney Newell that Attorney Carrillo was not copied on, she did recognize the bottom half of the e-mail. She testified that the e-mail was sent from "kvpoperations@gmail.com" to her business e-mail address, as well as to the e-mail addresses of Attorneys Newell and Theroux. In addition, Attorney Carrillo described the content of the message, and testified that the e-mail discussed the report the defendant recently made to the East Kingston police regarding e-mail messages she received. Further, Attorney Newell testified that she recalled answering the defendant's inquiry in the e-mail about "getting a case number for the [May 4] report that she made."

Finally, Attorney Theroux testified that she found in her client files an e-mail resembling State's Exhibit 20. She testified that although the format of the printed exhibit was different from the format that was in her electronic files, the content was the same. The e-mail was sent to her business e-mail address by "K. MacDonald Ruggiero," whom she understood was the defendant. Attorney Theroux testified that she did not have reason to believe that someone other than the defendant sent the e-mail. Further, Attorney Newell testified that she recalled responding to this e-mail. Moreover, the defendant admitted to sending the e-mail.

*III. Sufficiency of the Evidence*

Finally, the defendant contends the trial court erred in denying her motion to dismiss at the close of all the evidence because the State failed to prove, beyond a reasonable doubt, that she sent the subject text messages to herself. Specifically, the defendant maintains that the State failed to establish "the heart of [its] case" — that she "used the T-Mobile '1057' phone to send her '9495' [Verizon Wireless cell] phone text messages that she then falsely reported came from Mr. Ruggiero."

In response, the State argues that the defendant "mischaracterizes" the burden it had at trial. The State contends that with respect to the twelve

counts of falsifying physical evidence and the single count of false report, "[i]t only had to prove that, when [the defendant] presented the messages to Officer Iannuccillo, and told him that they came from Jeff, she knew this to be false."

The twelve counts of falsifying physical evidence each alleged that the defendant "purposely, believing that an investigation was about to be instituted regarding violations of a protective order, presented a text message . . . which she alleged was sent by Jeffrey Ruggiero, which she knew to be false, with the purpose to deceive a public servant who was engaged in said investigation." The charge of false report to law enforcement alleged that "on or about May 4, 2008 . . . [the defendant] knowingly gave false information to Officer Mark Iannuccillo . . . with the purpose of inducing the officer to believe that Jeffrey Ruggiero had committed an offense . . . when in fact she knew that was not true . . . ." Thus, contrary to the defendant's assertions, the State was not required to prove that she sent the text messages. Rather, the State had to establish, beyond a reasonable doubt, that when the defendant presented the text messages to Officer Iannuccillo and told him that Jeffrey sent them to her in violation of the restraining order, she knew that she was giving him false information with a purpose to deceive him.

■ Our review of a trial court's denial of a defendant's motion to dismiss based upon insufficiency of the evidence is guided by our well-established standard:

> To prevail upon his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation.

*State v. Marshall*, 162 N.H. 657, 666 (2011) (quotation omitted).

■ ■ The record in this case establishes that there was abundant evidence from which a rational juror could have found that the defendant presented text messages to Officer Iannuccillo which she claimed were from Jeffrey, but knew to be false, and that she knowingly and falsely reported that Jeffrey had violated a protective order by sending her the text messages. At trial, the State presented evidence that the defendant initially denied making any allegations to Officer Iannuccillo. During her

testimony, however, the defendant admitted to reporting the text messages to the police, but denied meeting with Officer Iannuccillo or any other member of the East Kingston police department regarding her allegations. Officer Iannuccillo testified that he was dispatched to the defendant's parents' East Kingston home on May 4, 2008, to respond to a possible violation of a restraining order. He further testified that the defendant provided him a two-page handwritten document listing all of the text messages she claimed Jeffrey had sent. His incident report, which included the defendant's handwritten attachment, as well as the police dispatch logs, confirmed his testimony. "Evidence that a defendant intentionally made an exculpatory statement that is later discovered to be false may constitute circumstantial evidence of consciousness of guilt." *State v. Evans*, 150 N.H. 416, 420 (2003).

Moreover, there was sufficient evidence to support a rational conclusion by the jury that the defendant used the 1057 phone to leave messages to herself, including the video recordings of the incoming calls from the 1057 number. Further, the State presented evidence that contradicted the defendant's claim that she could not have placed the March 20, 2008 telephone call from Oakland, California at 5:38 p.m. on the 1057 phone because she had not yet returned from her business trip to Tennessee. Flight records from Southwest Airlines established that the defendant's airplane arrived at the Oakland airport at 5:20 p.m., and a parking receipt from the Oakland airport indicated that the defendant left the airport garage at 7:21 p.m.

Based on the record before us, we conclude that there was sufficient evidence upon which a rational jury could find the defendant guilty of each of the charges beyond a reasonable doubt.

*Affirmed.*

DALIANIS, C.J., and DUGGAN, HICKS and LYNN, JJ., concurred.