NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2013-0076


THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER M. PALERMO

Argued: September 10, 2015
Opinion Issued: December 18, 2015


Joseph A. Foster, attorney general (Nicholas Cort, assistant attorney general, on the brief and orally), for the State.


David M. Rothstein, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.


CONBOY, J. Following a jury trial in Superior Court (Nicolosi, J.), the defendant, Christopher M. Palermo, was convicted on one count of aggravated felonious sexual assault, see RSA 632-A:2, I(i) (2007), one count of criminal trespass, see RSA 635:2 (Supp. 2014), and two counts of simple assault, see RSA 631:2-a (2007). On appeal, he argues that the trial court erred by: (1) ruling that the State sufficiently authenticated certain Facebook messages; (2) admitting evidence of his prior incarceration, parole status, and civil lawsuit against the New Hampshire State Prison; and (3) allowing the State to introduce a photograph of him. We affirm.

I.    Background

        The jury could have found the following facts.  In 2011, the defendant
and the victim's brother were inmates in the New Hampshire State Prison.
Through her brother, the victim learned that the defendant needed assistance
with a civil lawsuit he had filed against the New Hampshire Department of
Corrections and the State of New Hampshire.  The victim agreed to provide
such assistance.  Between October 2011 and January 2012, while the
defendant was incarcerated, he and the victim spoke on the telephone about
the lawsuit and "got to know each other."

        On January 27, 2012, the defendant was released from prison and went
to live with the victim and her family.  That same day, the victim's son, D.L.,
age 16, created a Facebook account for the defendant and showed him how to
send messages on the family's iPad from the Facebook application.  D.L. also
took a photograph of the defendant and "posted" it on the defendant's account.
The defendant was allowed to use the iPad whenever one of the victim's other
sons was at school or "in bed."

        On the evening of February 3, 2012, while the victim's husband was at
work, the victim, D.L., and the defendant were playing cards.  The victim had a
headache, and to help relieve it, the defendant began rubbing the victim's neck.
The defendant's "hands got a little 'roamy'" and the victim told him to "[w]atch"
them.  The defendant then moved both of his hands down the front of the
victim's tank top, and put them on her breasts.  She pushed him away and
when she pulled up her tank top the defendant's hands went down the back of
her pants onto her buttocks.  The victim stood up, pushed him away, and "told
him to cut it out."  She and D.L. then went into her bedroom and locked the
door.

        Shortly thereafter, the defendant "popped the lock" on the victim's
bedroom door and asked if he could watch television with them.  The victim
agreed.  The victim asked the defendant to pass her a box of candy.  The
defendant took a candy from the box, ran it up the victim's arm and down her
chest, and then "shoved it, along with his fingers, in [her] mouth."  The victim
bit the defendant's fingers.  He got upset and "demanded the iPad."  The victim
gave it to him and told him to leave the room.  The defendant left and she
locked the bedroom door again.

        A short while later, the defendant went back to the victim's bedroom,
again "popped the lock" on the door, and asked for the telephone.  The victim
gave it to him and told him to "[g]et out."  The defendant "popped the lock" on
the bedroom door two more times, looking for the keys to the victim's Ford
Explorer, but the victim refused to give them to him.

2

Soon thereafter, the defendant left the house "with some type of tool in his hand," entered the Ford Explorer and, for a period of time, was "underneath the driver's seat with the door open." The defendant came back into the house shortly after 12:00 a.m. on February 4. At some point the victim fell asleep.

Between 1:45 and 2:00 a.m., the victim began to awaken when she "felt rubbing" on her back and buttocks, and then felt hands go inside her sweatpants. She felt the hands go from her "backside to [her] front side and down to [her] crotch area," and inside her vagina. When the victim rolled over, she realized that it was the defendant who was touching her.

The victim's husband, who had returned from work, was in the bathroom when he heard a noise that "sounded like the door opening, almost like a pop or a cracking type noise." He went to the bathroom doorway and saw the defendant sitting on the bed next to the victim. From his vantage point, it appeared that the defendant "had his hands underneath the covers touching [the victim's] buttocks, groin; just about anything he could get his hands on." The victim's husband asked, "[W]hat are you doing in my room?" After a short pause the defendant left the room.

At about 8:00 a.m., the defendant told the victim that he was leaving. As the victim gave him a bag to use, he stated, "Last night was terrible and I was hoping that you would give me a pass, I'm really sorry." The victim's husband heard the defendant ask the victim for "a pass because he . . . felt that what he did the night before was out of line." Shortly thereafter, the defendant left the house.

Later that morning, D.L. opened the Facebook application on the family's iPad and the defendant's Facebook account appeared, indicating he had not signed out. The screen showed a message that had been sent by the defendant that day, stating: "Hey, how do you crack a Ford Explorer. I'm going to kill someone in a minute." D.L. showed the message to the victim. The victim then discovered other Facebook messages sent by the defendant that day. She testified that the messages stated: "I almost did the landlord's wife. Her husband walked in"; "she's trying to play hard to get, Bro, I'm gonna get mines"; "He came home from work and walked right in"; "Kids want iPad . . . don't got much time left. . . . Give her my number . . . tell to call"; and "I'm headed to Gloucester today, I'll be back later, love you, Bro."

The jury found the defendant guilty of aggravated felonious sexual assault, criminal trespass, and two counts of simple assault. This appeal followed.

3

II.    Facebook Messages

Before trial, the defendant sought to exclude all evidence of the Facebook messages unless the State could properly authenticate them. The State objected, and proffered evidence in support of authentication. Following an in-chambers hearing, the court ruled that, pursuant to New Hampshire Rule of Evidence 901, the State's proffered evidence was sufficient to authenticate the Facebook messages as having been authored by the defendant.

"The decision to admit or exclude evidence is within the discretion of the trial court." State v. Roy, 167 N.H. 276, 284 (2015) (quotation omitted). "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made." Id. (quotation omitted). "To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

The defendant argues that the court's ruling on authentication was erroneous because: (1) "someone else could have sent the messages from [his] open Facebook account"; (2) he "presented evidence that the [victim's] family had the opportunity to alter the Facebook messages"; and (3) he "presented evidence that the messages submitted by the [victim's] family were altered."

We have not previously addressed the foundational requirements for the authentication of Facebook messages. After a review of the record, we conclude that our established rules governing authentication are sufficient to address the issues in this case. Cf. Cotton v. State, 773 S.E.2d 242, 245 (Ga. 2015) ("We have held that documents from electronic sources such as the printouts from a website like Facebook are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence." (quotation and brackets omitted)); Campbell v. State, 382 S.W.3d 545, 549 (Tex. Ct. App. 2012) ("With respect to electronic communications — such as e-mails, text messages, and as in this case, Facebook — the rules of evidence, including rule 901, are considered at least generally adequate to the task." (quotation omitted)).

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.H. R. Ev. 901(a). "The bar for authentication of evidence is not particularly high." State v. Stangle, 166 N.H. 407, 409 (2014) (quotation omitted). "The proof necessary to connect an evidentiary exhibit to a defendant may be made by circumstantial evidence." Id. (quotation omitted). "The proponent need not rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be." Id.

4

(quotation and ellipsis omitted). The State need only demonstrate a rational basis from which to conclude that the exhibit did, in fact, belong to the defendant. State v. Ruggiero, 163 N.H. 129, 136 (2011). "[T]he contested evidence, if otherwise relevant, should be admitted once a prima facie case has been made on the issue of authentication." Stangle, 166 N.H. at 409 (quotation omitted). "Once the evidence is admitted, the rest is up to the jury." Id. at 410 (quotation omitted).

Although Rule 901(a) requires the proponent to present evidence of authenticity, the rule does not establish formal requirements as to the nature or quantum of proof. Id. Rather, Rule 901(b) provides a non-exhaustive list of examples of methods of authentication or identification that conform to the requirements of Rule 901(a), including:

> (1) *Testimony of witness with knowledge.* — Testimony that a matter is what it is claimed to be.
>
> . . . .
>
> (4) *Distinctive characteristics and the like.* — Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

N.H. R. Ev. 901(b)(1), (4).

Here, the defendant first argues that the court erred by ruling that the State sufficiently authenticated the Facebook messages as having been authored by him because "someone else could have sent the messages from [his] open Facebook account." He contends that the State's proffered authentication evidence was insufficient because: (1) the messages lacked distinctive characteristics; (2) the recipient of the messages did not testify; and (3) it would have been easy for someone to make it appear as though he authored the February 4 messages because he had not signed out of his Facebook account. We disagree.

In support of authentication, the State proffered that D.L. would testify that: (1) he took the defendant's photograph after the defendant moved in with his family; (2) he created a Facebook account for the defendant using the defendant's photograph; and (3) he showed the defendant how to use the family's iPad and the Facebook website. In addition, the State proffered that it would present evidence that the defendant used the iPad around the time the messages were sent, that the messages were sent from the iPad, and that the defendant's release from prison and subsequent arrival at the victim's home coincided with the creation of the Facebook account. The State also asserted that it would present evidence that the messages contained information only a

5

few individuals would know and that the information pertained specifically to the defendant's conduct.

Moreover, the State presented the court with a printout of the Facebook message stream, which started on February 1, days after the defendant's arrival at the victim's home, and ended on February 4, the day of the alleged assault. As the court found, the messages referred to the author's recent incarceration and parole status, which the State proffered were consistent with the defendant's circumstances. Likewise, the February 4 messages referenced the author's conduct consistent with the State's proffer regarding the anticipated testimony of the victim, the victim's husband, and D.L. as to the defendant's conduct earlier that morning and on the evening of February 3. Additionally, the message stating, "Kid wants iPad don't got much time left" was consistent with the State's proffer that the victim would testify that one of her other sons had the primary right to use the iPad. Thus, despite the defendant's assertion otherwise, the State's proffered authentication evidence contained sufficient identifying details to link the authorship of the messages to the defendant.

We also are not persuaded by the defendant's suggestion that the State had to present testimony from the recipient of the Facebook messages to sufficiently authenticate them. He points to our statement in Ruggiero that "because of the potential for unauthorized transmission of e-mail messages, authentication requires testimony from a person with personal knowledge of the transmission or receipt to ensure its trustworthiness." Ruggiero, 163 N.H. at 136 (quotation and brackets omitted). In Ruggiero, the State sought to authenticate certain e-mails attributed to the defendant through the testimony of the e-mail recipients. Id. at 136-37. We examined what proof is necessary to authenticate e-mails and whether, in the context of that case, the recipients' testimony sufficiently authenticated the e-mails. Id. at 135-37. Accordingly, our statement was made in the context of the issue before us in that case. To the extent that our language in Ruggiero could have conveyed that recipient testimony is required to authenticate all e-mails and other electronic communication under all circumstances, we now clarify that this is not the case.

Finally, contrary to the defendant's contention, the ease with which someone could have made it appear as though the defendant authored the February 4 messages because he failed to sign out of his Facebook account did not preclude authentication based upon the State's proffered authentication evidence. The State was not required to "rule out all possibilities inconsistent with authenticity, or prove beyond any doubt" that the Facebook messages were authored by the defendant. Stangle, 166 N.H. at 409. Rather, the State needed only to provide evidence sufficient to support a finding that the messages were authored by him. See N.H. R. Ev. 901(a).

6

The defendant also argues that the court erred because he presented evidence that the victim's family had the opportunity to, and did, in fact, alter the messages. Prior to trial, the defendant presented the court with documents from a "Facebook experiment" conducted by defense counsel. The documents included: (1) a printout of a mock Facebook message exchange printed directly from Facebook; (2) a printout of the mock Facebook message exchange that had been copied and pasted into a Word document; and (3) a printout of the mock Facebook message exchange that had been copied and pasted into a Word document and then altered. He contends that because the Word documents he presented to the court shared similar characteristics with the Facebook documents the victim and her family provided to the State, he demonstrated that the victim and her family did not print the messages directly from a Facebook page as they claimed and, thus, could have, and did, alter the messages. Under these circumstances, he asserts that the State's proffered evidence was insufficient to authenticate the messages.

Although the court did not make a finding concerning the "Facebook experiment," we "must assume that the trial court made subsidiary findings necessary to support its general ruling," In the Matter of Aube & Aube, 158 N.H. 459, 466 (2009) (quotation omitted). Thus, we assume the court found that the defendant's evidence did not require the State to present further evidence to satisfy the foundational requirements for authentication. Based upon the State's proffered authentication evidence, as described above, we conclude that such a finding was a sustainable exercise of discretion.

Accordingly, we hold that the trial court sustainably exercised its discretion when it found the Facebook messages were sufficiently authenticated.

III.     Prior Incarceration, Parole Status, and Civil Lawsuit Against the State Prison

The defendant next argues that the trial court erred by admitting evidence of his prior incarceration, parole status, and civil lawsuit against the state prison. Prior to trial, the defendant sought to exclude evidence of his "prior bad acts," arrests, and convictions pursuant to New Hampshire Rules of Evidence 403 and 404(b). The State objected, arguing that the evidence would not be used as character evidence, but rather "to establish the context of the defendant's relationship with the victim and why she permitted him to parole to her home." The State maintained that any potential prejudice caused by the evidence could be addressed with a curative instruction. Following a hearing, the court ruled that the State was allowed

> to give evidence about how [the defendant] met [the victim],
> through her brother. That [the defendant was] in prison at the
> time, and that [the victim] helped [the defendant] with a lawsuit

7

while [he was] in the prison, against the prison, but nothing to do with the underlying facts of the lawsuit.

The defendant argues that, although relevant, the evidence was unfairly prejudicial under New Hampshire Rule of Evidence 403 because it conveyed to the jury his prior criminal history. "We have recognized that evidence that provides context to a witness's statements or actions may have significant probative value." State v. Towle, 167 N.H. 315, 323 (2015). "Nevertheless, where the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, it must be excluded." Id.

Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case.

Roy, 167 N.H. at 285 (quotation omitted). "Unfair prejudice is not, of course, mere detriment to a defendant from the tendency of the evidence to prove guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial." Id. (quotation omitted). "Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged." Id. (quotation omitted).

"The trial court is in the best position to gauge the prejudicial impact of particular testimony, and what steps, if any, are necessary to remedy that prejudice." Id. (quotation omitted). "Thus, we afford considerable deference to the trial court's determination in balancing prejudicial impact and probative worth." Towle, 167 N.H. at 324. "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made." Roy, 167 N.H. at 284 (quotation omitted). We will not disturb a trial court's ruling on such an issue absent an unsustainable exercise of discretion. See id. "To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

Here, the court admitted the evidence of the defendant's prior incarceration, parole status, and civil lawsuit against the state prison for the limited purpose of providing context as to how the victim and the defendant met. Although the extent of the details of the evidence gives us pause, we cannot conclude that the court unsustainably exercised its discretion by admitting it. See State v. Dedrick, 132 N.H. 218, 226 (1989) ("We will not overturn the superior court's decision on appeal simply because we might have ruled differently."), abrogated on other grounds by State v. Ford, 144 N.H. 57,

8

62-63 (1999), and State v. Spencer, 149 N.H. 622, 625 (2003).  The criminal conduct underlying the defendant's prior incarceration was not introduced at trial.  Cf. State v. Russo, 164 N.H. 585, 590-91 (2013) (holding that lack of specifics regarding defendant's prior criminal conduct reduced prejudicial effect of reference to his parole status).  Nor were any of the terms of his parole revealed.

Furthermore, the court provided two limiting instructions to the jury.  At the end of the victim's testimony upon direct examination, the court stated:

> During the testimony of [the victim] you heard that the [defendant] was in prison at the time that she became acquainted with him.  I am instructing you that you may not speculate as to why [the defendant] was in prison.  And you may not consider that evidence as to his bad character or any -- character evidence at all.
>
> The parties have stipulated that [the defendant] has never been convicted of a sexual offense.  I allowed that evidence for a limited purpose, and that was to offer an explanation of how [the defendant] and [the victim] came to know each other and how he came to be living in her home at the time the alleged incident happened, and that's the only purpose for which you may consider the evidence.  In your deliberations you may not consider the evidence that he was in prison for any other purpose.

Similarly, in its final jury instructions, the court stated:

> In this case you heard evidence during trial that [the defendant] was in prison.  You may not speculate about why he was in prison.  The parties agreed that [the defendant] has never been convicted of a sexual offense, nor was he in prison for any accusation or conviction for a sexual offense.  This evidence was introduced for the limited purpose of explaining how the alleged victim and the [defendant] became acquainted and how he came to live with her and her family.
>
> You are not to consider this evidence as to the [defendant's] general character and you may not infer that because he committed a different crime, he may have committed one or more of the crimes with which he's charged.  You may only consider the evidence that he was in prison for the limited purpose for which it was admitted and that's the context in which he met the [victim].

Jurors are presumed to follow the court's instructions.  See id. at 591.  Thus, the court's instructions obviated any unfair prejudice that might have been caused by the admission of the evidence.

9

Given the limited purpose for which the evidence was admitted, the lack of any specifics regarding the defendant's prior criminal conduct, and the trial court's limiting instructions, we cannot conclude that the trial court unsustainably exercised its discretion when it admitted evidence of the defendant's prior incarceration, parole status, and civil lawsuit against the state prison.

IV.     Photograph of the Defendant

At trial, the State sought to introduce a photograph of the defendant that depicted him smoking a cigarette, wearing a closely-fitted knit cap, and wearing a t-shirt displaying a picture of a sword and a skull, and the word "Redemption." The photograph also showed tattoos on the defendant's arms. The defendant objected, arguing that the photograph was not relevant and was unfairly prejudicial. The State asserted that the photograph was necessary to its explanation of why the victim did not call the police immediately following the assaults. The State maintained that the victim was afraid of the defendant and, thus, wanted to use the photograph to show the jury that the defendant was "a big scary guy."

The court ruled that the photograph was inadmissible because the victim never testified that the defendant's "style" scared her, the jury could see that the defendant was a "big guy" without the photograph, and the t-shirt the defendant was wearing in the photograph was prejudicial. Subsequently, however, the court allowed the State to introduce a redacted copy of the photograph with the defendant's t-shirt and arm tattoos blacked out. The State showed the redacted photograph to D.L. during his direct examination and appears to have referenced the photograph in its closing argument.

The defendant argues that the redacted photograph had no probative value and was unfairly prejudicial. The State argues that this issue was not preserved for our review because although the defendant objected to admission of the photograph before its redaction, he did not specifically object to the admission of the redacted photograph. It also asserts that admission of the redacted photograph was not error, but, even if it was error, the error was harmless beyond a reasonable doubt. For the purposes of this appeal, we assume, without deciding, that the defendant has preserved this issue for our review. We need not decide whether admission of the redacted photograph was erroneous because we agree with the State that any error was harmless. See State v. Ramsey, 166 N.H. 45, 47-48 (2014) (applying harmless error review to admission of evidence assumed to be in violation of the New Hampshire Rules of Evidence and State and Federal Confrontation Clauses).

"An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error." State v. Wells, 166 N.H. 73, 82 (2014) (quotation omitted). The State bears the burden of proving that an error

is harmless.  Id.  "An error may be harmless if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt."  Id. (quotation omitted).  "In determining whether an error was harmless, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence."  Id. (quotation omitted).

Here, for the jury to convict the defendant of the aggravated felonious sexual assault charge, the State had to prove, beyond a reasonable doubt, that he "knowingly engaged in sexual penetration of [the victim] through concealment or by the element of surprise by digital penetration of her genital opening before she had an adequate chance to flee or resist because she was asleep in bed at the time."  See RSA 632-A:2, I(i).  The alternative evidence of the defendant's guilt on this charge included the victim's testimony describing the sexual assault and her husband's corroborating testimony.  It also included the defendant's own statements in which he sought a "pass" and apologized for his behavior.  See People v. Grathler, 858 N.E.2d 937, 943 (Ill. App. Ct. 2006) (a defendant's apologies to victim could be construed as demonstrating his consciousness of guilt).  The alternative evidence also included the Facebook messages stating: "I almost did the landlord's wife.  Her husband walked in"; "she's trying to play hard to get, Bro, I'm gonna get mines"; and "He came home from work and walked right in."

As to the simple assault charges, the State had to prove, beyond a reasonable doubt, that the defendant "did knowingly cause unprivileged physical contact to [the victim] by grabbing her buttocks" and "by grabbing her breasts."  See RSA 631:2-a.  With respect to these charges, the alternative evidence included the victim's testimony describing the assaults.  It also included D.L.'s testimony that he saw the defendant, who was rubbing the victim's neck, go "from the [victim's] neck down [her] arms to her chest down to her butt."  D.L. further testified that while this was occurring, the victim "was telling [the defendant] . . . stop, don't touch me."

Finally, for the jury to convict the defendant of the criminal trespass charge, the State had to prove, beyond a reasonable doubt, that he "knowingly entered and remained in a bedroom in a residence . . . an occupied structure adapted for the overnight accommodation of persons therein in defiance of an order to leave which was personally communicated to him by [the victim] the owner or other authorized person."  See RSA 635:2.  With regard to this charge, the alternative evidence of the defendant's guilt included the victim's testimony that she told the defendant to leave the bedroom after he "demanded the iPad." She also testified that she told him to "[g]et out" after he "popped the lock" on the bedroom door and asked for the telephone.  She stated that, over the course of the evening she told the defendant to get out of her bedroom "between . . . eight and eleven times," and that after the last time she did not

invite him to come in. Both the victim and her husband testified that the defendant returned to the bedroom around 2:00 a.m. on February 4.

Given the overwhelming nature of the alternative evidence of the defendant's guilt, and the cumulative and inconsequential nature of the redacted photograph in relation to the strength of the State's evidence of guilt, we conclude, beyond a reasonable doubt, that the photograph did not affect the verdict. Thus, any error was harmless.

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.