NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Strafford
Case No. 2022-0634
Citation: State v. Warren, 2025 N.H. 5

THE STATE OF NEW HAMPSHIRE

v.

ERIN WARREN

Argued: October 10, 2024
Opinion Issued: January 22, 2025

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Sam M. Gonyea, assistant attorney general, on the brief and orally), for the State.

Pamela E. Phelan, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

MACDONALD, C.J.

[¶1] Presenting a question of first impression, the principal issue before us is whether permitting the victim to testify at trial via a one-way livestream video feed outside the presence of the defendant, Erin Warren, violated the

defendant's right under the New Hampshire Constitution to meet the witnesses against her "face to face." N.H. CONST. pt. I, art. 15. We hold that it did. We reverse the defendant's second-degree assault conviction and remand. Because we conclude with respect to the defendant's conviction for first-degree assault that the error was harmless, we affirm that conviction.

I. Background

[¶2] The jury could have found the following facts. On July 17, 2018, A.D., the defendant's five-year-old daughter, was admitted to Frisbee Memorial Hospital (hospital) with a wound on her head measuring twelve centimeters horizontally and five centimeters vertically. The wound was "swollen" and "red" with "pus coming out of it," and was infected with multiple kinds of bacteria. The wound had been present for "quite some time," potentially for weeks. A.D. was treated in the hospital with intravenous antibiotics for several days.

[¶3] While A.D. was in the hospital, linear bruises were observed on A.D.'s forearms and wounds on her cheek, ear, and foot. One of the treating physicians described the injuries on A.D.'s arms as "almost a perfect rectangle across both and very symmetric," with bruising marks "in the same spot, . . . same size, shape" with "defined edges" that "looked like something had been strapped across her arms." Another doctor testified that he noted "two linear scar[s] . . . on the anterior aspect of both arms, which look like something had been tied there."

[¶4] Concerned that medical professionals were not alerted sooner about A.D.'s head wound, and that A.D. had several injuries at various stages of healing, hospital staff made a report to the New Hampshire Division for Children, Youth and Families (DCYF) and the Rochester Police Department.

[¶5] After more than a week in the hospital, A.D. was discharged into the custody of a licensed foster parent who previously had custody of A.D. for approximately nine months in 2017. A.D. was examined by a pediatric nurse practitioner for the Child Advocacy and Protection Program who concurred with doctors at the hospital that the severity of the wound was due to a delay in treatment.

[¶6] After several weeks in foster care, A.D. disclosed to a caretaker that the defendant had taped her mouth shut. DCYF was informed, and A.D. was interviewed by the director of the Child Advocacy Center. The defendant was subsequently charged with, inter alia, first-degree assault for failing to seek medical attention for the wound on A.D.'s head, and second-degree assault for causing bodily injury to A.D. by binding her arms for a prolonged period of time. See RSA 631:1 (2016); RSA 631:2 (2016).

2

[¶7] Before trial, the State moved to allow A.D. to testify at trial via one-way video feed "to prevent her from having to see her mother." The State proposed that A.D. testify "from elsewhere in the Courthouse, and counsel can conduct examination either in the same room as A.D. or from the video feed, provided that A.D. does not have to see the defendant in the video." In support, the State asserted that if A.D. were to see her mother she "would have an immediate physical response" and "could become unresponsive." The State argued that "[t]he reliability of [A.D.'s] testimony would be otherwise assured under the State's proposed procedure" because A.D. "would be present for live cross-examination; she would be testifying under oath; and, her demeanor would be capable of being observed by jury, judge and the defendant." The defendant objected, arguing that permitting A.D. to testify outside her presence would violate her "right to confrontation under New Hampshire law."

[¶8] At the hearing on the motion, a licensed mental health counselor who had been treating A.D. in therapy for more than a year testified that when A.D. experiences trauma she is "very quick to revert to . . . primitive trauma responses." The counselor testified that her sense was that if A.D. were to see her mother she would have "a really strong response," would "immediately assume that she was going back into her mother's custody," and "would both have difficulty answering questions and understanding what's being asked of her." The Superior Court (Howard, J.) granted the State's motion. The trial court adopted the analysis set forth in Maryland v. Craig, 497 U.S. 836 (1990), "accept[ing] that" this court "would likely adopt the same test in this scenario" because we "already adopted the test" in State v. Hernandez, 159 N.H. 394 (2009). The trial court applied the test set forth in Craig and made "particularized findings specific to" the "four essential components of confrontation" — physical presence, the witness's oath, cross-examination, and the observation of demeanor by the trier of fact. See Craig, 497 U.S. at 846.

[¶9] First, the trial court found that the witness would be administered the oath. Second, it found that defense counsel would "have the ability to cross-examine the witness," either by being "physically present in the room with the witness, or to question from the courtroom." Regarding observation of demeanor by the trier of fact, the court found that because the witness "will be on the video screen," the trier of fact "can make all of the same observations that it can make as if the witness was in the courtroom." Finally, regarding physical presence, the trial court found that there was "an 85 to 90 percent chance that [A.D.] will, essentially, shut down and not be able to communicate, that she'll have a visceral trauma response to being present with her mother." Thus, based on "an important public policy to avoid that kind of reaction, to avoid additional injury to the child, to cause setbacks in the child's emotional development, in light of the abuse that she has allegedly experienced in her life," the court determined that it was "necessary . . . to protect [A.D.] from the presence of her mother when she testifies."

3

[¶10] Following a four-day jury trial, the defendant was convicted of both first-degree assault and second-degree assault. This appeal followed.

II. Analysis

[¶11] On appeal, the defendant argues that the trial court erred by: (1) allowing A.D. to testify remotely outside the defendant's presence; (2) admitting evidence of uncharged allegations under New Hampshire Rule of Evidence 404(b); (3) finding A.D. competent to testify; and (4) failing to apply the correct standard when reviewing confidential records in camera.

A. Confrontation Clause

[¶12] The defendant first argues that allowing A.D. to testify outside of the defendant's presence violated her confrontation rights under the State and Federal Constitutions. See N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI. We consider the defendant's argument under the New Hampshire Constitution first, see State v. Ball, 124 N.H. 226, 231 (1983), and refer to federal law only if it aids our analysis. See id. at 233.

[¶13] The New Hampshire Constitution provides that an individual accused of a crime "shall have a right . . . to meet the witnesses against him face to face." N.H. CONST. pt. I, art. 15. The legal principles involved in constitutional interpretation are well-established. Warburton v. Thomas, 136 N.H. 383, 386 (1992). In construing a provision of the constitution, we must look to its purpose and intent. Id. at 386-87. We assess not only "the natural significance of the words used by the framers," but also the historical context in which the language was used in light of the surrounding circumstances when it was adopted. See State v. Mack, 173 N.H. 793, 801 (2020).

> Reviewing the history of the constitution and its amendments is often instructive, and in so doing, it is the court's duty to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in light of the surrounding circumstances. The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted.
>
> Additionally, when interpreting the New Hampshire Constitution, we often look to interpretations of comparable state and federal constitutional provisions in order to inform and guide our analysis. Interpretations by other courts are most persuasive when the language of the constitutional provision at issue is similar to the wording in our constitution.

4

Id. at 801-02 (quotations and citations omitted).  Our review of a constitutional challenge is de novo.  See State v. Maga, 166 N.H. 279, 282 (2014).

[¶14] We begin by determining what the particular words "meet the witnesses against him face to face" meant in 1784 when that language was adopted in New Hampshire.  "Meet" was defined as "To come face to face," and "To meet" meant "To encounter; to close face to face."  2 S. Johnson, A Dictionary of the English Language 122 (4th ed. 1773).  "Face to Face" was defined as "When both parties are present," and "To face" meant "To meet in front."  1 S. Johnson, A Dictionary of the English Language 124 (4th ed. 1773).  "Present" meant "Not absent; being face to face; being at hand."  2 S. Johnson, supra at 407.  Thus, under the literal meaning of the words, Part I, Article 15 mandates that an individual accused of a crime has the right to be in the presence of and face the witnesses testifying at trial.  That language has remained unchanged to the present time.

[¶15] When the framers of the New Hampshire Constitution chose the language of Part I, Article 15, several other states had constitutions containing language that an individual accused of a crime had a right "to be confronted with" or "to confront" witnesses.  See Com. v. Bergstrom, 524 N.E.2d 366, 371 n.9 (Mass. 1988) (referencing the constitutions of Virginia, Pennsylvania, Delaware, Maryland, North Carolina, and Vermont).  "The Massachusetts Declaration of Rights, which was adopted after these documents, was the first to use the language 'to meet the witnesses against him face to face.'"  Id.  "Presumably, the framers of [the Massachusetts] Constitution were aware of the other States' provisions and chose more explicit language to convey unequivocally their meaning."  Id.

[¶16] Because New Hampshire modeled much of its constitution on the constitution adopted by Massachusetts four years earlier, and the Massachusetts Constitution contains a nearly identical provision regarding a defendant's right to confrontation, "we give weight to the interpretation given that provision by the Massachusetts Supreme Judicial Court."  Mack, 173 N.H. at 802 (quotation and brackets omitted); see Lawrence Friedman, The New Hampshire State Constitution 69 (2d ed. 2015) ("The framers of the 1784 constitution based [Part I, Article 15] on the Part I, Article 12 of the Massachusetts Constitution of 1780.").  It is important to note, however, that we rely on such precedent merely for guidance and do not consider our results bound by it.  See Mack, 173 N.H. at 802.

[¶17] The Massachusetts Supreme Judicial Court's decision in Commonwealth v. Bergstrom is directly on point.  In Bergstrom, the court considered whether permitting child witnesses to testify through electronic means during a criminal trial outside the presence of the defendant and of the jury complied with the guarantee in the Massachusetts Declaration of Rights that "[e]very subject shall have a right . . . to meet the witnesses against him

5

face to face." Bergstrom, 524 N.E.2d at 371 (emphasis omitted). Prior to trial, the trial court found that the children would "suffer psychological trauma if required to testify in front of their father in a face-to-face confrontation" and allowed the children to give their testimony in a room separate from the courtroom via simultaneous closed circuit television transmission. Id. at 369-70 (quotation omitted).

[¶18] The Supreme Judicial Court reversed. Id. at 378. The court observed that "[c]onstitutional language more definitively guaranteeing the right to a direct confrontation between witness and accused is difficult to imagine." Id. at 371. The court determined that "[t]he plain meaning of assuring a defendant the right 'to meet the witnesses against him face to face' is that the accused shall not be tried without the presence, in a court of law, of both himself and the witnesses testifying against him." Id. As the court reasoned, "To interpret the words of [the constitution's] mandate as requiring only that the defendant be able to see and hear the witness renders superfluous the words 'to meet' and 'face to face.'" Id.

[¶19] The court emphasized that it had never interpreted the accused's right "to meet" a witness against him "face to face" "as permitting introduction of an available witness's testimony outside a defendant's presence." Id. at 373. The court noted that the constitutional mandate "states a great principle of government for the security of liberty and the ascertainment of truth in prosecutions for crime." Id. (quotation omitted).

[¶20] We have likewise characterized the right to confrontation as "one of the basic safeguards of liberty." State v. Cook, 135 N.H. 655, 661 (1992) (quotation omitted). The constitutional right to confront adverse witnesses is fundamental and of such importance that the State's interest in protecting a certain class of witnesses must fall before the right of the accused to seek out the truth in the process of defending himself. See State v. Howard, 121 N.H. 53, 58 (1981). Although the right is not absolute, we have recognized few exceptions. See State v. Christensen, 135 N.H. 583, 585 (1992); see, e.g., State v. Gabusi, 149 N.H. 327, 332 (2003) (explaining that hearsay statements "ordinarily do not violate a defendant's right to confront witnesses so long as they bear particularized guarantees of trustworthiness, or fall within a firmly rooted hearsay exception" (quotation and citation omitted)); State v. Peters, 133 N.H. 791, 796 (1991) (holding that a video tape deposition of a witness taken in the presence of the defendant may subsequently be admitted at trial if the trial court makes a specific finding, at the time of trial, that the witness continues to be unavailable to testify in the presence of the defendant).

[¶21] We hold that Part I, Article 15 clearly and unambiguously requires a face-to-face confrontation between the accused and the witness. Given this conclusion, we clarify that prior intimations in our case law — drawn from federal cases — that a right to direct confrontation is merely a "preference"

6

does not comport with state law.  See, e.g., Hernandez, 159 N.H. at 403 (citing Peters, 133 N.H. at 794); Peters, 133 N.H. at 794 (quoting Craig, 497 U.S. at 849).  Further, we consider the test set forth in Maryland v. Craig as limited to challenges brought solely under the Sixth Amendment to the United States Constitution.  Cf. Hernandez, 159 N.H. at 404 (advising in dicta that Craig provides "guidance" for proceedings involving challenges under the State Constitution's Confrontation Clause).

[¶22] Here, where the witness testified from a location outside the presence of the defendant and could not see the defendant while she was testifying, there was no face-to-face meeting, thereby violating the plain meaning of Part I, Article 15.  Although we are sympathetic to the trial court's concern for the child witness, we have no authority to ignore the plain language of the State Constitution and override the accused's constitutional right to face-to-face confrontation.  See Richard v. Governor, 177 N.H. ___, ___ (2024), 2024 N.H. 53, ¶18 (explaining that it is beyond our authority to add words to the constitution that the framers did not see fit to include); see also Bergstrom, 524 N.E.2d at 377 ("The right of the accused to be tried in the manner which our Constitution guarantees cannot dissolve under the pressures of changing social circumstance or societal focus.").  In light of our conclusion that the defendant was denied her right to confront the witness "face to face" in accordance with the State Constitution, we need not address her arguments under the Federal Constitution.  See Ball, 124 N.H. at 232.

## B.  Harmless Error

[¶23] Because we conclude that the defendant's confrontation right was violated, we next consider whether reversal is required.  See State v. Hall, 152 N.H. 374, 379 (2005).  The State argues that, should we find error in the trial court's Confrontation Clause ruling, any such error was harmless beyond a reasonable doubt.  The State asserts that even if A.D.'s testimony was stricken from the record, "there was ample evidence to conclude beyond a reasonable doubt that the defendant committed first-degree assault by not seeking medical attention for [A.D.'s] head wound sooner and committed second-degree assault by binding her arms."

[¶24] To establish harmless error, the State must prove beyond a reasonable doubt that the error did not affect the verdict.  State v. Rouleau, 176 N.H. 400, 407 (2024), 2024 N.H. 2, ¶20.  This standard applies to both the erroneous admission and exclusion of evidence.  Id.  To determine whether the State has proven beyond a reasonable doubt that an error did not affect the verdict, we must evaluate the totality of the circumstances at trial.  Id.

[¶25] The factors that we consider in assessing whether an error did not affect the verdict include, but are not limited to: (1) the strength of the State's case; (2) whether the admitted or excluded evidence is cumulative or

7

inconsequential in relation to the strength of the State's case; (3) the frequency of the error; (4) the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; (5) the nature of the defense; (6) the circumstances in which the evidence was introduced at trial; (7) whether the court took any curative steps; (8) whether the evidence is of an inflammatory nature; and (9) whether the other evidence of the defendant's guilt is of an overwhelming nature. Id. at 407-08.

[¶26] Applying the harmless error analysis to the first-degree assault conviction, we conclude beyond a reasonable doubt that the victim's testimony did not affect the verdict. The defendant was found guilty of recklessly causing serious bodily injury to A.D. by failing to seek medical attention for a wound on A.D.'s head, resulting in severe infection and/or scarring. At trial, there was overwhelming evidence that the defendant's failure to seek medical attention for A.D.'s wound resulted in severe infection.

[¶27] The jury heard from the emergency room doctor who was working on the day A.D. was brought to the hospital. He testified that A.D. had "a horrible looking wound that looked festered and infected, and just something that you could not possibly miss." In his opinion, given the amount of swelling and the extent of the wound, it was "at least a week old." The jury also heard testimony from the pediatrician who treated A.D. in the hospital that A.D. had "a very large head wound" which "definitely looked infected because the yellow material there was all actually pus[] that was draining from the area, and it looked like it had been there for at least several days, potentially a week." The pediatrician testified that had the wound been treated earlier, it "most likely" would not have gotten to the level that it did. Instead, the infection caused "swelling in the tissue and caus[ed] the tissues to spread wider," and the wound "being open and left open for some period of time, allowed multiple bacteria" to enter the wound and "caused more tissue damage and swelling."

[¶28] In addition, the jury heard from the registered nurse, an expert in wound care, who assessed A.D.'s wound at the hospital. She testified that there was "a lot of necrotic tissue present" and that the head wound had been there for "[p]erhaps a matter of weeks." Further, a doctor who, at the time of the underlying incident was the general surgeon at the hospital, testified as an expert in general medicine, surgery, and wound care. When A.D. was in the hospital, he was consulted to remove the eschar from A.D.'s head wound. The doctor explained that an open wound, "especially one that's been there for a long time," will develop an eschar, "which is a dense area of dead tissue and fluids that form sort of a really thick scab that adheres to the wound, and unless [it] is removed, the wound will never heal." He testified that three bacteria were present in A.D.'s wound, including Streptococcus, Staphylococcus, and Pseudomonas, which indicated that "the wound had been present for quite some time." In the doctor's opinion, the wound would have been present on A.D.'s head for "weeks" before coming to the hospital. His

8

opinion was based on the fact that the wound was "all the way down into the subcutaneous tissue," which "takes a fairly long time to do."

[¶29] Given the expert medical testimony discussed above, even if A.D.'s testimony were stricken from the record, there was other evidence of an overwhelming nature that the defendant was guilty of first-degree assault.

[¶30] Regarding the second-degree assault charge, however, we cannot conclude beyond a reasonable doubt that the victim's testimony did not affect the verdict. The defendant was convicted of second-degree assault for knowingly causing bodily injury to A.D. by binding A.D.'s arms for a prolonged period of time, causing abrasions and/or scarring to A.D.'s arms. At trial, A.D. testified that when she was at the hospital she had scars on her wrists and face that were caused by being duct taped to a wall in the closet by her mother or tied with belts. The State argues that even without A.D.'s testimony, there was "ample evidence to conclude beyond a reasonable doubt that the defendant . . . committed second-degree assault by binding her arms." However, A.D.'s testimony provided the only direct evidence that the defendant was responsible for binding her arms.

[¶31] Accordingly, we affirm the first-degree assault conviction, reverse the second-degree assault conviction, and remand. Because the remaining issues raised by the defendant may arise on retrial, we address those arguments.

### C. Uncharged Conduct

[¶32] The defendant argues that the trial court erred in admitting evidence of uncharged conduct, "particularly evidence that [the defendant] taped A.D.'s mouth shut and forced her to take cold showers and stand for extended periods of time." The defendant asserts that the State failed to satisfy the requirements of New Hampshire Rule of Evidence 404(b). Specifically, the defendant argues that the first and third prongs of Rule 404(b)(2) were not met.

[¶33] The State counters that the uncharged conduct evidence was directly related to a disputed issue: why A.D. delayed disclosure of the abuse. Given the defendant's theory that disclosure was delayed because the allegations were suggestively planted in A.D.'s mind, the State argues that the evidence supported a different explanation — that A.D. did not disclose "out of fear of retribution and, thus, waited until she was in a safe situation to disclose."

[¶34] Rule 404 provides in part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in

9

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b)(1). Evidence of other crimes, wrongs or acts is admissible only if: (1) "it is relevant for a purpose other than proving the person's character or disposition"; (2) "there is clear proof, meaning that there is sufficient evidence to support a finding by the fact-finder that the other crimes, wrongs or acts occurred and that the person committed them"; and (3) "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." N.H. R. Ev. 404(b)(2). The State bears the burden of demonstrating the admissibility of prior bad acts. State v. Clark, 174 N.H. 586, 593 (2021).

[¶35] We review challenges to the trial court's evidentiary rulings under our unsustainable exercise of discretion standard. State v. Tufano, 175 N.H. 662, 665 (2023). For the defendant to prevail under this standard, she must demonstrate that the trial court's decision was clearly untenable or unreasonable to the prejudice of her case. See id. In applying our unsustainable exercise of discretion standard of review, we determine only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made. State v. Letarte, 169 N.H. 455, 461 (2016). Because the trial court ruled on the admissibility of the challenged evidence before trial, we consider only the arguments and evidence presented at the pretrial hearing. State v. Nightingale, 160 N.H. 569, 573 (2010).

[¶36] Following a hearing, the trial court found that "the evidence is not being offered for a propensity purpose but is instead offered to rebut the defense's suggestibility argument and to provide an explanation for A.D.'s delayed disclosure." Although the court recognized that the evidence was "certainly prejudicial to the defendant," it determined that any prejudice did not substantially outweigh the probative value and that "any unfair prejudice to the defendant can be mitigated with an appropriate jury instruction as to the limited purpose for which they may consider the uncharged conduct."

[¶37] On appeal, the defendant argues that the court erred in finding the State met its burden on the first prong of the Rule 404(b) analysis, asserting that the "probative value of the evidence" to rebut the defendant's theory of suggestibility and to explain A.D.'s delayed disclosure "was minimal." However, we agree with the State that under the first prong of the Rule 404(b) analysis, the strength of the probative value of the evidence "has no bearing on whether the evidence was relevant for a purpose other than propensity." To satisfy the first prong of the Rule 404(b) analysis, the uncharged conduct evidence must have some direct bearing on an issue actually in dispute and have a clear connection to the evidentiary purpose for which it is offered. See State v. Colbath, 171 N.H. 626, 633 (2019). It is evident from the record before us that

10

the explanation for A.D.'s delayed disclosure was actually in dispute and that, as the trial court found, the evidence had a clear connection to rebut the defendant's theory of suggestibility.

[¶38] The defendant also argues that there was error under the third prong of the Rule 404(b) analysis because, given that "the uncharged conduct evidence is very similar" to the charged crimes, there was a "substantial risk that the jury would conclude that [the defendant] committed the charged acts because she had abused A.D. in other similar ways on other occasions." The defendant made this same argument in her objection to the State's motion, and the trial court rejected it. The trial court is in the best position to gauge the impact of prejudicial testimony and what steps to take to remedy that prejudice. Clark, 174 N.H. at 590. Accordingly, we give the trial court broad latitude when ruling on the admissibility of potentially unfairly prejudicial evidence. Id. Because the record establishes an objective basis sufficient to sustain the discretionary decision made, we hold that the trial court's ruling is not clearly untenable or unreasonable. See State v. Roy, 167 N.H. 276, 284 (2015).

D. Competency

[¶39] The defendant argues that the trial court "plainly erred in finding A.D. competent." (Capitalization omitted.) The day before trial, the defendant filed a motion requesting that the trial court determine whether A.D. was competent to testify as a witness. In support, the defendant argued that "[t]he State has raised the possibility that its child witness, A.D. age 9, may be unable to understand questions or compose a coherent response when faced with questions about her alleged abuse at the hands of her mother" and, therefore, under those circumstances, the court should voir dire A.D. to determine her competency under New Hampshire Rules of Evidence 601 and 603.

[¶40] At the start of trial the following day, the court agreed to question A.D. Following that colloquy, the trial court found that A.D. was competent to testify. The court found that: A.D. "clearly understands the difference between telling the truth and telling a lie and can appreciate the oath"; she was "able to articulate fundamentals of her life, including her school, her friends, her favorite subjects, things she likes to do at school"; she did not appear to have "any difficulty with narrating, any difficulty with remembering details of her life"; and there was no question in the court's mind "that [A.D.] does have the capacity at age nine to articulate appropriate to her age and to narrate and remember and convey her recollections." The defendant did not object to the court's competency determination.

[¶41] On appeal, the defendant argues that the record does not support a finding that A.D. was competent to testify under New Hampshire Rule of

Evidence 601. Because the defendant did not object to the competency finding, she seeks plain error review. To find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. State v. Hodges, 176 N.H. 751, 754 (2024), 2024 N.H. 44, ¶9; see Sup. Ct. R. 16-A.

[¶42] Every person is presumed competent to be a witness. See N.H. R. Ev. 601(a). This presumption may be overcome "if the court finds that the witness lacks sufficient capacity to observe, remember and narrate as well as understand the duty to tell the truth." N.H. R. Ev. 601(b). Whether a witness is competent to testify is a question of law for the trial court. State v. Horak, 159 N.H. 576, 579 (2010). When the record supports the court's determination of competency, we will not disturb that determination absent an unsustainable exercise of discretion. Id. Because so much depends on the trial court's firsthand observations of the witness, its conclusion that the witness is competent is entitled to great deference. Id. We have reviewed the record and determine that it supports the findings made by the trial court and, therefore, we conclude that the court did not unsustainably exercise its discretion.

### E. In Camera Review

[¶43] Finally, the defendant argues that the trial court "may have erred in failing to disclose material in the DCYF and Community Partners' records reviewed in camera." (Capitalization omitted.) Prior to trial, the defendant filed an assented-to motion for in camera review of DCYF records and counseling records from Community Partners related to A.D. Following its review of the Community Partners records, the trial court determined that they did not meet the "'essential and reasonably necessary'" test for disclosure, citing State v. Gagne, 136 N.H. 101 (1992). The court explained that the records "involve counseling and other therapies provided to A.D. both before and after the time period encompassed in the charged offenses" and that "[a]lthough the records occasionally make reference to the nature and existence of this case, none of the records bear directly or indirectly on any issue in this case, including A.D.'s credibility." Following its review of the DCYF records — including "investigative reports, notes, assessments, police reports, interviews, medical records, and other documents relating to" A.D. and the defendant — the court determined that twelve pages of the documents and a video interview of A.D. taken at the hospital met the "essential and reasonably necessary" test for disclosure.

[¶44] On appeal, the defendant argues that the trial court erred by applying "the wrong standard" to its in camera review when it relied on Gagne instead of our decision in State v. Girard, 173 N.H. 619, 628 (2020), in which we clarified the meaning of the "essential and reasonably necessary" standard. However, given that our decision in Girard was not issued until five months

12

after the trial court conducted its in camera review in this case, the court did not have the benefit of that opinion.

[¶45] In Girard, we explained that under the "essential and reasonably necessary" standard, the trial court must determine if material and relevant evidence is in fact contained in the records. Id. at 628. Here, the trial court determined that the records did not bear directly or indirectly on any issue in the case. We agree with the State that, in accord with the trial court's reasoning, the records were not material or relevant and, therefore, the court "applied the correct standard in substance, even if not in form." See State v. Williams, 173 N.H. 540, 543 (2020) (explaining that the interpretation of a trial court order presents a question of law, which we review de novo).

[¶46] The defendant requests that, in the event the trial court did not apply the wrong standard, we review the "remainder of the DCYF records and all of the Community Partners records" to determine whether the court erred in failing to disclose additional records. We review a trial court's ruling on the management of discovery to determine whether its decision is sustainable. Hodges, 176 N.H. at 757, 2024 N.H. 44, ¶18. When a defendant argues on appeal that a trial court's ruling regarding the disclosure of privileged records is unsustainable, we must review the same records and determine whether the ruling was clearly unreasonable or untenable to the prejudice of her case. See id. After reviewing the records that were examined by the trial court, we conclude that the court's decisions regarding these records were not clearly unreasonable or untenable to the prejudice of the defendant's case. Id. Accordingly, we find no error.

> Affirmed in part; reversed in part; and remanded.

BASSETT, DONOVAN, and COUNTWAY, JJ., concurred.