NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
Case No. 2023-0550
Citation: State v. Harris, 2025 N.H. 32


THE STATE OF NEW HAMPSHIRE

v.

TYRESE HARRIS

Argued: May 6, 2025
Opinion Issued: July 22, 2025


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Audriana Mekula, assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.


DONOVAN, J.

[¶1] The defendant, Tyrese Harris, appeals his convictions on two alternative-theory counts of second degree murder alleging that he knowingly killed the victim and that he recklessly killed the victim under circumstances manifesting extreme indifference to the value of human life, see RSA 630:1-b, I(a) & I(b) (2016), one count of falsifying evidence, see RSA 641:6 (2016), and

one count of reckless conduct, see RSA 631:3 (Supp. 2024). On appeal, the defendant argues that the Superior Court (Delker, J.) and (Nicolosi, J.) erred by: (1) admitting into evidence a recorded phone call between the defendant and his mother; (2) instructing the jury on the reasonable necessity of the defendant's use of deadly force; and (3) denying the defendant's motion to dismiss the falsifying physical evidence charge for insufficient evidence. We conclude that the trial court sustainably exercised its discretion by admitting the defendant's recorded phone call and instructing the jury on the law applicable to self-defense. However, we also conclude that the record fails to establish that the State introduced sufficient evidence to prove beyond a reasonable doubt that the defendant falsified physical evidence. Accordingly, we reverse the defendant's conviction of falsifying evidence, but otherwise affirm.[1]

## I.  Facts Presented at Trial

[¶2] The jury could have found, or the record otherwise supports, the following facts. Around 3:20 p.m. on October 29, 2022, the defendant was driving his SUV in heavy traffic in Manchester with his fiancée, Kathiuska Morales, in the front passenger seat. As the defendant began to merge onto South Willow Street from an on-ramp, he sped up to get in front of the victim's 18-wheeler truck. The victim responded by "laying on the horn" of his truck. Witnesses testified that they observed an object thrown from the defendant's car toward the truck's windshield after hearing the truck's horn. The defendant's SUV came to a stop light where the victim slammed the truck's brakes directly behind the defendant.

[¶3] While the parties were stopped at the red light, the victim exited the truck and "aggressively" approached the driver's side window of the defendant's vehicle. Surveillance footage showed the victim "crossing the path between the two vehicles [at] 3:22:23." One bystander observed that the victim was "clearly upset"; another witness testified, "[y]ou could tell it was . . . going to get physical." Accounts varied as to what happened next. One bystander observed, but could not hear, what looked like a verbal argument. Another witnessed the victim unsuccessfully attempt to open the door to the defendant's SUV and cock his arm back, and another bystander saw the victim making "hand gestures" when he approached the defendant's window, "as if he was aggravated." Two witnesses observed the victim spit into the defendant's vehicle. In response, the defendant fired a single shot that struck the victim in the head, causing his death. Based upon surveillance footage that captured the sound of the encounter, the gunshot occurred at 3:22:25, just two seconds after the victim approached the defendant's vehicle. At trial, Morales testified

---

[1] The defendant's brief does not address his reckless conduct conviction; therefore, he has waived any argument pertaining to that conviction. See State v. Leroux, 175 N.H. 204, 210 (2022).

that the defendant told her that he shot the victim because the victim spat on the defendant's face.

[¶4] After firing the shot, the defendant sped off, steering around two cars ahead of him and driving through a red light at a high rate of speed. Another motorist, who followed the defendant in an effort to obtain the defendant's license plate number, testified that the defendant drove erratically and at high speed away from the scene through a gas station and in the opposite travel lane.

[¶5] Morales testified that the defendant drove fast and erratically to the west side of Manchester, where he parked the SUV outside of an apartment rented by their friend, Veronica Savastano. Surveillance footage showed the defendant, carrying a laundry basket, and Morales exit the SUV and walk toward Savastano's apartment building at 3:30 p.m. Surveillance footage from the same camera showed the defendant and Morales exiting the building at 4:54 p.m. and entering a different vehicle. According to Morales, one of the defendant's friends drove them to their apartment.

[¶6] Within an hour of the shooting, and while the defendant and Morales were still at Savastano's apartment, the Manchester Police Department (MPD) obtained and executed a search warrant authorizing the search of the defendant's apartment. There, they found evidence relating to a 9 mm Winchester Luger handgun, including a gun case bearing a serial number that was subsequently used to trace the ownership of the firearm to the defendant. However, MPD did not locate the handgun at the defendant's apartment. Nor did they find the gun when an MPD officer searched the defendant's SUV the following day. MPD never recovered the handgun used in the shooting and Morales testified that she did not see the defendant with the gun at any time after the shooting. The defendant was arrested at approximately 4:13 a.m. on October 30.

[¶7] On November 7, an MPD detective spoke to Savastano and searched the kitchen area of her apartment, where he found and seized a laundry basket and sweatshirt believed to have been worn by the defendant on the day of the shooting. The detective later obtained a recording of a telephone call between the defendant and his mother that occurred on December 2, while the defendant was incarcerated pending trial. An excerpt of the call was admitted as a full exhibit at trial and played to the jury. On the call, the defendant told his mother:

> I didn't get to think enough in those seconds . . . those three
> seconds that they described. . . . That's why I got spit on. I got spit
> on directly in my face, in my mouth, towards Kathy. That's assault
> . . . . Your life was took cuz you disrespect. Disrespect gets your
> life taken. . . . Respect gets you further in life.

## II. Pre-Trial Litigation on the Defendant's Recorded Call

[¶8] Prior to trial, the defendant filed a motion in limine seeking to prohibit the State from introducing this call into evidence at trial. The defendant argued that the call was unfairly prejudicial pursuant to New Hampshire Rule of Evidence 403, because the fact that the call was recorded could lead the jury to infer that he was incarcerated and "think he is dangerous and a criminal rather than innocent until proven guilty." The defendant maintained that an effort to contextualize his statements would unfairly prejudice him because explaining "his dysregulated and angry state would require the defense to explain that he received an adverse ruling on bail" and that "he was being victimized by another inmate" who had stolen his PIN to make phone calls. The defendant also claimed that the statements made during the December 2 call lacked probative value because they were not relevant "to his mental state at the time of the alleged crime" given the passage of time between the deadly encounter and the phone call. The State objected, arguing that the defendant's statements would not unfairly prejudice him because the State would not admit any evidence referencing the defendnat's incarceration. The State also argued that the statements were highly probative, given the defendant's self-defense claim, which put at issue his mental state at the time of the shooting.

[¶9] At a pre-trial motions hearing, the parties reiterated the arguments made in their pleadings. The defendant also argued that the call was misleading and unfairly prejudicial because, without context, the jury could infer that the defendant's angry tone was directed at the victim or that the defendant was "just an angry and violent person." The defendant also asked the court to admit the defendant's police interview, if the phone call was deemed admissible, in order to cure the misleading impression made by the jail call because, in the interview, the defendant explained that he shot the victim out of fear and to protect himself and his family. The State, however, maintained that the defendant's interview with the police and his December 2 phone call with his mother were "unrelated," and the admission of the call did not require the admission of the interview.

[¶10] The Trial Court (Delker, J.) denied the defendant's motion, finding that the prejudicial effect of the call did not substantially outweigh its probative value, because any references to the defendant's incarceration would be redacted and the State would identify the conversation as a "recorded call." The court also observed that "[j]ail calls are routinely admitted at trial and this call is highly probative on the issue of self-defense," and concluded that "playing this call for the jury will not open the door to the defendant's statements to the police. That is part of a different conversation, at a different time, under different circumstances."

4

III.     Jury Instruction Litigation

[¶11] Prior to trial, the parties filed proposed jury instructions.  As relevant to this appeal, the State, relying upon our decision in State v. Etienne, 163 N.H. 57, 70 (2011), sought to add the following language to the self-defense instruction:

> The defendant must reasonably believe that the amount of force that he used was necessary for self-defense or defense of others.  A person is not permitted to use excessive force in self-defense, only a reasonable amount of force.  The defendant can use the amount of force which he believed was necessary under the circumstances as long as, at the time, there were reasonable grounds for his belief.

[¶12] On the third day of trial, the parties discussed jury instructions with the Trial Court (Nicolosi, J.).  The defendant objected to the State's proposed addition to the instruction, arguing that the self-defense statute does not require a person using deadly force in self-defense to use only the degree of force that was reasonably necessary.  The defendant noted that Etienne was decided before the legislature amended the self-defense statute in 2011 by removing the duty to retreat when the actor is "anywhere he or she has a right to be," RSA 627:4, III(a) (2016), and argued that, to the extent the Etienne Court addressed the issue of necessity, it did so in dicta.  The defense concluded its argument by stating that the legislature's 2011 amendment permits the use of any degree of deadly force when the actor is anywhere he or she has a right to be.

[¶13] The parties again discussed the jury instruction on the fourth day of trial.  They agreed that the trial court's proposal to include the following language was appropriate: "In considering what is objectively reasonable, you should consider all of the circumstances surrounding the incident.  You may consider the often-fast-moving nature of dangerous situations and the necessity of making decisions in less-than-ideal circumstances."  The defendant argued, however, that the jury also needed to be instructed that the State has the burden of proving that a lesser amount of alternative force was available to the defendant, and contended that it would be improper to "ask the jury to speculate about what other force could have been used."  The State argued that, because the jury instructions would inform the jury that the State had the burden of disproving self-defense and that they must weigh all of the evidence "in the context of not just the self-defense itself but all these other facets of self-defense," it was not necessary to instruct the jury that the State must also prove that an alternative use of lesser force was available to the defendant.

5

[¶14] The court agreed with the State and decided to instruct the jury on the reasonable necessity of the defendant's use of deadly force, but included the following language: "The Defendant can use the amount of force which he believed was necessary under the circumstances, as long as, at the time, there were reasonable grounds for his belief." The court also added language proposed by the defendant that "[t]he availability of a route of retreat, if you find the Defendant was not required to retreat, is not a factor you can consider in assessing whether the force used was reasonably necessary." The court declined to include the defendant's proposed language that the State had the burden of proving "that the amount of force used was not reasonably necessary and that the defendant had the ability to use less force at the time he acted."

[¶15] The defendant stood trial over five days in July 2023. After the State rested its case-in-chief, the defendant moved to dismiss all four charges. As relevant to this appeal, the defendant argued that the State presented insufficient evidence that he concealed, destroyed or removed the firearm used in the shooting because the only evidence presented to the jury was that the police did not find the firearm despite searching the defendant's car and his and Savastano's apartments. The State argued that sufficient evidence was admitted to prove that the defendant falsified physical evidence based upon the inability of the police to find the firearm and the defendant's decision to flee the scene at high speed and to "hide the gun from that investigation." The State also argued that it did not need to prove the location of the evidence if it proved that the defendant prevented the police from recovering the firearm. The trial court denied the motion.

[¶16] After the defendant presented his case, the jury convicted him on all four charges. This appeal followed.

IV.    Analysis

a. Admission of the Recorded Phone Call

[¶17] We begin by addressing the defendant's argument that the trial court erred by admitting into evidence his recorded phone call with his mother. The defendant maintains that the trial court's Rule 403 ruling was erroneous because the probative value of the evidence was substantially outweighed by its risk of unfair prejudice. He also argues, in the alternative, that the trial court erred by not ruling that the admission of the recorded phone call opened the door to the defendant's statement to the police. We address each argument in turn.

[¶18] We review rulings on the admissibility of evidence for an unsustainable exercise of discretion. State v. Warren, 177 N.H. __, __ (2025), 2025 N.H. 5, ¶35. Pursuant to this standard, we assess whether the trial court's rulings are clearly untenable or unreasonable to the prejudice of the

6

defendant's case.  Id.  When determining whether an evidentiary ruling constitutes a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made.  State v. Lambert, 147 N.H. 295, 296 (2001).  However, a trial court's interpretation of court rules is not entitled to deference; rather, we review the trial court's interpretation de novo.  State v. Munroe, 173 N.H. 469, 472 (2020).

[¶19] On appeal, the defendant concedes that the phone call to his mother was relevant.  Yet, he argues its probative value was "relatively low" because the phone call occurred more than a month after the shooting, which "diminished the reliability of a statement about mental processes [during the shooting] that occurred in a span of seconds."  The defendant also posits that the context of the statement — his frustration with a recent bail decision and the theft of his PIN — reduced its probative value.  According to the defendant, "[t]he statement's limited probative value was substantially outweighed by its risk of unfair prejudice" in that the jury would infer that he had been incarcerated before trial based upon a decision by a judge "before he had been found guilty of the charges" against him.  We disagree.

[¶20] Generally, the prejudice required to predicate reversible error is based upon "an undue tendency to induce a decision against the defendant on some improper" ground, "commonly one that is emotionally charged."  State v. Palermo, 168 N.H. 387, 395 (2015) (citation and quotations omitted).  Evidence is unfairly prejudicial if its primary purpose or effect is to "appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish" or trigger other instincts that "may cause a jury to base its decision on something other than the established propositions in the case."  Id. (citations and quotations omitted).  The trial court is in the best position to weigh the prejudicial impact of evidence and to determine what steps, if any, are necessary to remedy any prejudice.  Id. at 395-96.  For this reason, we "afford considerable deference to the trial court's determination in balancing prejudicial impact and probative worth."  Id. at 396 (citations and quotations omitted).

[¶21] Here, as the trial court observed, "[j]ail calls are routinely admitted at trial" and the State's redaction of portions of the call that referenced the house of corrections limited any prejudice to the defendant's case.  In contrast, the content of the defendant's conversation with his mother was highly probative of his state of mind, a contested issue and a fact of consequence raised by the defendant's self-defense claim.  See State v. Dukette, 145 N.H. 226, 232 (2000).  Nor are we persuaded that the passage of 34 days between the shooting and the phone call significantly diminished the probative value of this evidence.  Cf. State v. Allen, 128 N.H. 390, 397 (1986) (finding that the weight of a prior bad act that occurred more than three years prior to the charged conduct may have been reduced "to some degree" but "its force had certainly not diminished entirely").

[¶22] We also reject the defendant's argument that the admission of the recorded phone call opened the door to his statements to the police pursuant to the specific contradiction doctrine. This doctrine applies to situations where "a party introduces admissible evidence that creates a misleading advantage for that party, and the opposing party is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage." State v. Roman, 176 N.H. 367, 371 (2023). We cannot conclude that the admission of the defendant's recorded phone call created a misleading advantage for the State. Rather, the defendant's statements to his mother were consistent with his statement to Morales immediately after the shooting: that he shot the victim because the victim spat on the defendant's face. Consequently, we conclude that the trial court sustainably exercised its discretion in finding that the admission of the recorded phone call did not mandate the admission of the defendant's police interview.

### b. Self-Defense Jury Instruction

[¶23] Next, we address the defendant's arguments regarding the trial court's jury instruction on self-defense. On appeal, the defendant argues that the trial court erred by including the following language in its self-defense instruction:

> Finally, even if the Defendant was entitled to use deadly force and was not required to retreat because he was in a lawful place and not the initial aggressor, he nonetheless must reasonably believe that the amount of deadly force that he used was necessary for defense of himself or another. A person is not permitted to use excessive force in self-defense, only a reasonable amount of force. The Defendant can use the amount of force which he believed was necessary under the circumstances as long as, at the time, there were reasonable grounds for his belief.

The defendant maintains that this instruction did not fairly instruct the jury on the law of self-defense because RSA 627:4, II does not require that a party employing deadly force believe that the use of such force is reasonably necessary. The defendant also avers that our statements in Etienne regarding the use of this concept in self-defense instructions were merely dicta that we should not rely upon in reviewing this issue in his appeal.

[¶24] The scope and wording of jury instructions generally fall within the sound discretion of the trial court, and, as such, are reviewed for an unsustainable exercise of discretion. Etienne, 163 N.H. at 70; see also State v. Evans, 150 N.H. 416, 420 (2003). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." Etienne, 163 N.H. at 70. We will not reverse a conviction "unless the jury charge fails to

8

cover fairly the legal issues in the case." Evans, 150 N.H. at 420. When reviewing jury instructions, "we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." Etienne, 163 N.H. at 70 (quotations and citations omitted).

[¶25] In Etienne, we reviewed a self-defense instruction which contained, in part, the same language explaining the reasonable necessity of using deadly force that is in dispute here. See id. There, Etienne raised the same argument that the defendant raises here: that the "instruction was erroneous because 'nothing in the language of RSA 627:4, II . . . requires that the actor's use of deadly force be necessary, in the sense that no lesser, non-deadly force would suffice to prevent harm from the attacker's use of deadly force.'" Id. at 71.

[¶26] The Etienne Court acknowledged that the statute is susceptible of at least two reasonable interpretations:

> Either the restrictions placed upon the use of deadly force implicitly indicate that reasonable necessity under the circumstances is required for the defensive use of deadly force or the explicit requirement of reasonable necessity in the non-deadly force provision, and not in the deadly force provision, implies that reasonable necessity is not required for the use of deadly force in the specific circumstances set forth in the statute.

Id. at 73. We also acknowledged that the competing interpretations were supported by various canons of statutory interpretation, but ultimately, we found the State's interpretation more persuasive, in part because that interpretation reflected the least, rather than the most, change to the common law, given that our common law "has long required reasonable necessity to justify the use of deadly force." Id. at 73-74; see State v. Elementis Chem., 152 N.H. 794, 803 (2005) ("We have often stated that we will not interpret a statute to abrogate the common law unless the statute clearly expresses that intent.").

[¶27] We further reasoned in Etienne that our prior decision in State v. Vassar, 154 N.H. 370 (2006), supported our construction of RSA 627:4, II as implicitly requiring reasonable necessity to justify the use of deadly force. Etienne, 163 N.H. at 75. In Vassar, we held that the defendant was entitled to a self-defense instruction because the "jury could have concluded from the testimony that the defendant reasonably believed deadly force was necessary to stave off the threat of 'unlawful, deadly force.'" Vassar, 154 N.H. at 374 (quoting RSA 627:4, II(a) (emphasis added)). In Etienne, we also observed that the legislature had twice amended RSA 627:4 in the wake of prior decisions, such as Vassar and State v. Warren, 147 N.H. 567 (2002), in which we concluded that the deadly force provision implicitly required reasonable necessity, but the legislature had done so without vitiating our interpretation of

9

the statute.  See Etienne, 163 N.H. at 76.  That proposition applies with even greater force today.

[¶28] In the thirteen years since we decided Etienne, the legislature has not amended RSA 627:4, II to exclude the common law requirement that a defensive use of deadly force requires that such force must be reasonably necessary, despite the 2011 amendment of RSA 627:4 that removed the duty to retreat when the actor is anywhere he or she has the right to be.  See RSA 627:4, III; see also Etienne, 163 N.H. at 76.  Presumably, if our long-standing interpretation of the statute had misconstrued its language, the legislature would have subsequently clarified the text.  See State v. Moran, 158 N.H. 318, 323 (2009).  Accordingly, we conclude that the trial court sustainably exercised its discretion by including the reasonable necessity of using deadly force in its self-defense instruction.[2]

### c. Sufficiency of Evidence Supporting the Falsifying Physical Evidence Conviction

[¶29] Finally, we address the defendant's argument that the State presented insufficient evidence to prove that he falsified physical evidence beyond a reasonable doubt.  The defendant maintains that the State's evidence established only that the police failed to find the firearm used in the shooting where and when they looked for it.  The State counters that sufficient circumstantial evidence was presented at trial that excluded all other rational conclusions consistent with innocence.  We agree with the defendant.

[¶30] A challenge to the sufficiency of evidence raises a question of law which we review de novo.  State v. Seibel, 174 N.H. 440, 445 (2021).  "When considering such challenges, we objectively review the entire record to determine whether any rational trier of fact could have found guilt beyond a reasonable doubt, considering the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the State."  Id. (citation omitted.).  "We examine each item of evidence in the context of the entire case, and not in isolation."  Id.  The defendant bears the burden of proving that the evidence was insufficient to prove his guilt.  Id.  However, when, as here, evidence of an element is solely circumstantial, the circumstantial evidence must exclude all reasonable conclusions other than the defendant's guilt.  See id.; see also State v. King, 168 N.H. 340, 342 (2015) (defining circumstantial evidence doctrine, as expressed in jury instructions).

[¶31] As the falsifying physical evidence count was charged in this case, the State had to prove beyond a reasonable doubt that the defendant: (1)

---

[2] In light of our conclusion, we have no occasion to decide whether our ruling in State v. Etienne, 163 N.H. 57, 70 (2011), with respect to the trial court's self-defense jury instruction, constitutes dicta.

10

believed that an investigation into the shooting of a firearm was about to be instituted; (2) destroyed, concealed or removed the firearm used in the shooting; (3) with the "purpose to impair its verity or availability in such proceeding or investigation." RSA 641:6, I. The trial court accordingly instructed the jury on the three elements of falsifying evidence: "one, the Defendant did destroy, conceal or remove physical evidence; two, he did so believing that an investigation was pending or about to be instituted; and three, he acted with the purpose to impair its [verity] or availability in such investigation." The court also gave the standard jury instruction defining the purposeful mental state.

[¶32] The State argues that evidence of the defendant's conduct in the twelve hours between the shooting and his arrest established that he fled the scene of the shooting at high speeds, did not attempt to contact the police, drove to Savastano's apartment where he changed clothes, and had a friend drive him to his apartment after the defendant abandoned his SUV near Savastano's apartment. According to the State, from this evidence "the jury could reasonably infer that the defendant concealed the gun in the same way he tried to conceal himself, his SUV, and his clothes from the police in the hours following the shooting, and successfully did so, as the gun had not been found prior to trial." However, as the State concedes in its brief, its evidence on at least one element of the falsifying physical evidence charge was circumstantial.

[¶33] Our review of the record establishes that, with respect to the falsifying evidence charge, the State's circumstantial evidence failed to exclude all other rational conclusions consistent with the defendant's innocence. The undisputed evidence demonstrates that the shooting occurred shortly before 3:30 p.m. on October 29. Thereafter, the defendant drove to the west side of Manchester where he parked his SUV at approximately 3:30 p.m. Video surveillance captured the defendant and Morales walking towards Savastano's apartment building with the defendant carrying what appeared to be a laundry basket. The defendant and Morales stayed at Savastano's apartment until approximately 4:54 p.m. when, according to video surveillance footage, they appeared on the sidewalk outside of the apartment building before a friend drove them in another car to their apartment. They stayed in the apartment for an hour or two before returning to Savastano's apartment.

[¶34] An MPD officer searched the defendant's apartment "within an hour or so of the incident," or about 4:30 p.m., without locating the firearm. MPD did not attempt to search the defendant's apartment thereafter. At 9:42 p.m. on October 29, an MPD officer located the defendant's SUV near Savastano's apartment building. A search of the SUV the following day yielded no firearm. The defendant was arrested at approximately 4:13 a.m. on October 30, but the State did not admit any pre-arrest or post-arrest statements made by the defendant regarding the location of the firearm. Nine days after the shooting,

an MPD detective searched the kitchen area of Savastano's apartment where he found the laundry basket and some clothing. The detective did not search any other areas of Savastano's apartment and the record does not reveal whether Savastano had any information or was questioned about the firearm. Similarly, as to the location of the firearm, Morales testified only that the defendant kept the firearm in the center console of his vehicle. She did not observe the firearm in the defendant's possession after the shooting and she could not recall the defendant bringing anything into or leaving anything at Savastano's apartment.

[¶35] Based upon this evidence, we conclude that at least one rational conclusion consistent with the defendant's innocence was not excluded by the State's circumstantial evidence. For example, as the defendant observes, "[t]he evidence is fully consistent with the proposition that [the defendant] left the gun in his apartment after returning there" before his arrest and after the police searched it. After considering all of the evidence and the reasonable inferences drawn therefrom in the light most favorable to the State, we conclude that the State's circumstantial evidence was insufficient to prove beyond a reasonable doubt that the defendant falsified physical evidence.

V.    Conclusion

[¶36] In sum, we find no error in the trial court's evidentiary ruling admitting the defendant's recorded phone call. We also uphold the trial court's decision to include the reasonable necessity language as part of the use of deadly force instruction. However, we reverse the defendant's falsifying physical evidence conviction because the State's circumstantial evidence was insufficient to support that conviction as a matter of law, and we vacate his sentence thereon.

<u>Affirmed in part and reversed in part</u>.

MACDONALD, C.J., and COUNTWAY, J., concurred.

12